1  Donald L. Gaffney (#005717)
   Benjamin W. Reeves (#025708)
2  Evans O'Brien (#026521)
   Jill H. Perrella (#026270)
3  SNELL & WILMER L.L.P.
   One Arizona Center
4  400 E. Van Buren
   Phoenix, AZ 85004-2202
5  Telephone: (602) 382-6000
   Facsimile: (602) 382-6070
6  dgaffney@swlaw.com
   breeves@swlaw.com
7  eobrien@swlaw.com
   jperrella@swlaw.com
8  *Attorneys for Arizona Eco Development LLC*

9  Christopher R. Kaup (#014820)
   J. Daryl Dorsey (#024237)
10 TIFFANY & BOSCO, P.A.
   Third Floor, Camelback Esplanade II
11 2525 E. Camelback Road
   Phoenix, AZ 85016-4237
12 Telephone: (602) 255-6000
   Facsimile: (602) 255-0103
13 crk@tblaw.com
   jdd@tblaw.com
14 *Attorneys for the Ad Hoc Committee of Note Holders*

15              **IN THE UNITED STATES BANKRUPTCY COURT**

16                   **FOR THE DISTRICT OF ARIZONA**

| 17 | In re | Chapter 11 |
|---|---|---|
| 18 | GRANITE DELLS RANCH HOLDINGS, LLC, | Case No. 2:12-bk-04962-RTBP |
| 19 | CAVAN MANAGEMENT SERVICES, LLC, | Case No. 2:12-bk-20222-RTBP |
| 20 | Debtor. | (Jointly Administered) |

| 21 | |
|---|---|
| 22 | This pleading   ■   Granite Dells Ranch Holdings<br>relates to:        ■   Cavan Management Services |

23
24           **AMENDED DISCLOSURE STATEMENT IN SUPPORT OF**
25                **AD HOC COMMITTEE OF NOTE HOLDERS**
26              **AND ARIZONA ECO DEVELOPMENT LLC'S**
27                **JOINT PLAN OF REORGANIZATION**
28              **CORRECTED AS OF JANUARY 24, 2013**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION AND SUMMARY | 1 |
|  | A. Purpose Of Disclosure Statement | 1 |
|  | B. Limitations On Information Contained In Disclosure Statement | 4 |
|  | C. Order Governing Plan Confirmation Process | 5 |
| II. | INFORMATION REGARDING JOINT PLAN AND DISCLOSURE STATEMENT | 6 |
|  | A. Summary Of The Joint Plan | 8 |
| III. | LIMITATIONS ON REPRESENTATIONS | 9 |
| IV. | VOTING PROCEDURES AND REQUIREMENTS | 10 |
|  | A. Who Is Entitled To Vote | 10 |
|  |    1. Allowed Claims | 10 |
|  |    2. Impaired Claims | 11 |
|  | B. Procedures For Voting | 11 |
|  |    1. Submission Of Ballots | 11 |
|  |    2. Incomplete Ballots | 12 |
|  |    3. Withdrawal Of Ballots | 12 |
|  |    4. Questions And Lost Or Damaged Ballots | 12 |
|  | C. Summary Of Voting Requirements | 12 |
| V. | BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING | 14 |
|  | A. The Debtor And Its Property | 14 |
|  | B. Pre-Bankruptcy Events | 16 |
|  | C. Prepetition And Postpetition Management Of The Debtor | 16 |
| VI. | SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE | 17 |
|  | A. Commencement Of The Chapter 11 Case | 17 |
|  | B. Employment Of Professionals | 17 |
|  | C. Arizona Eco's Stay Relief Motions And Motion To Dismiss | 18 |
|  | D. Debtor's Allegations as to Arizona Eco | 18 |
|  |    1. Debtor's Litigation Against Arizona Eco | 18 |
|  |    2. Additional Disclosures Requested By Debtor | 20 |
|  | E. The CMS Bankruptcy Case And Joint Administration | 21 |
|  | F. Plans | 22 |
| VII. | OVERVIEW OF THE JOINT PLAN | 23 |
|  | A. Brief Explanation Of Chapter 11 Reorganization | 23 |
|  | B. Solicitation Of Acceptances Of The Joint Plan | 24 |
|  | C. Unimpaired Classes | 25 |

D.    Classification Of Claims .................................................................. 25

E.    Treatment Of Claims Under The Joint Plan....................................... 26

    1.    Classified Claims ..................................................................... 26

F.    Estate Assets ................................................................................... 32

G.    Implementation And Funding Of The Joint Plan ............................... 32

    1.    Priority Claim Payments ........................................................... 33

    2.    Property Dispositions ............................................................... 33

H.    Distributions On Account Of Claims Allowed As Of The Effective Date .......... 34

I.    Distribution On Account Of Claims Allowed After The Effective Date............. 34

    1.    Payments And Distributions On Disputed Claims.................... 34

    2.    Special Rules For Distributions To Holders Of Disputed Claims .......... 35

J.    The Liquidation Board ...................................................................... 35

    1.    Qualifications Of The Liquidation Board .................................. 35

    2.    Meetings Of The Liquidation Board ......................................... 36

    3.    Winding Up Of The Debtor ....................................................... 36

K.    Cancellation Of Old Membership Interests....................................... 36

L.    Operative Documents........................................................................ 36

M.    Administration Pending Effective Date ............................................. 37

N.    Post-Confirmation Fees; Final Decree .............................................. 37

O.    Additional Implementation Of The Joint Plan .................................... 37

    1.    Assumption Or Rejection Of Executory Contracts And Unexpired Leases Under The Joint Plan............................................. 37

VIII.    BAR DATES FOR ALL CLAIMS ............................................................. 38

IX.    LIMITATION OF LIABILITY ...................................................................... 38

X.    DESCRIPTION OF OTHER PROVISIONS OF THE JOINT PLAN ........... 39

A.    Vesting Of Assets............................................................................. 39

B.    Injunction ......................................................................................... 39

C.    Retention Of Jurisdiction .................................................................. 39

D.    Preservation Of Estate Causes Of Action ........................................ 41

E.    Conditions To Confirmation And Effective Date ............................... 42

    1.    Conditions To Confirmation ..................................................... 42

    2.    Conditions To Effectiveness .................................................... 43

    3.    Waiver Of Conditions ............................................................... 44

F.    Non-Allowance Of Penalties And Fines ............................................ 44

G.    Amendment And Withdrawal Of The Joint Plan................................ 44

ii

H.      Filing Of Objections To Claims ................................................................ 45

I.       Settlement Of Objections After Effective Date ...................................... 45

J.       Distributions On Allowance Or Disallowance Of Disputed Claims .................... 45

K.      Effectuating Documents; Further Transactions; Timing ........................... 46

L.       Exemption From Transfer Taxes .......................................................... 46

M.      Method Of Payment .......................................................................... 47

XI.     ACCEPTANCE AND CONFIRMATION OF THE JOINT PLAN ........................... 47

A.      Confirmation Hearing ........................................................................ 47

B.      Objections To Confirmation Of The Joint Plan .................................... 47

C.      Requirements For Confirmation Of The Joint Plan ............................... 48

        1.       Best Interests Of Creditors Test ........................................... 48

        2.       Feasibility ............................................................................ 48

        3.       Accepting Impaired Class .................................................... 48

D.      Confirmation Over Dissenting Class (Cram Down) ............................. 49

        1.       No Unfair Discrimination ..................................................... 49

        2.       Fair And Equitable .............................................................. 49

XII.    RISK FACTORS ...................................................................................... 50

A.      Liquidation Factors ........................................................................... 51

B.      Certain Bankruptcy-Related Considerations ....................................... 51

        1.       Risk Of Non-Confirmation Of The Joint Plan ...................... 51

        2.       Nonconsensual Confirmation .............................................. 51

XIII.   TAX CONSEQUENCES OF THE JOINT PLAN ........................................... 52

XIV.    ALTERNATIVES TO THE JOINT PLAN AND CONSEQUENCES OF
        REJECTION ............................................................................................ 54

A.      Liquidation Under Chapter 7 ............................................................. 54

B.      Alternative Plans .............................................................................. 55

XV.     LIQUIDATION ANALYSIS ......................................................................... 56

A.      Note Holders Committee's Liquidation Analysis ................................. 58

XVI.    RECOMMENDATION AND CONCLUSION ................................................. 59

## TABLE OF CONTENTS
### (continued)

Page

**Exhibits:**

EXHIBIT "1":     Ad Hoc Committee of Note Holders and Arizona Eco Development LLC's Joint Plan of Reorganization for Granite Dells Ranch Holdings, LLC Corrected as of January 24, 2013

EXHIBIT "2":     Ballot

EXHIBIT "3":     Operating Agreement of NH Co. LLC

EXHIBIT "4":     Subordination Suit Complaint

EXHIBIT "5":     Constructive Trust Suit Complaint

EXHIBIT "6":     Articles of Organization of NH Co. LLC

EXHIBIT "7":     E-mail from Stuart Swanson to David Cavan and reply

EXHIBIT "8":     E-mail from David Cavan to David Combs and reply

EXHIBIT "9":     E-mail from David Combs to David Cavan

EXHIBIT "10":     E-Mail from David Combs to Stuart Swanson

EXHIBIT "11":     Confidentiality Agreement from Combs/Wilkinson to Swanson

EXHIBIT "12":     Meeting Notes of Jason Gisi with Gary Burton

EXHIBIT "13":     Broker's Opinion of Value of the Note Holders' Parcels

EXHIBIT "14":     Debtor's Addendum to the Disclosure Statement

EXHIBIT "15":     Payments from GDRH Bank Accounts for Year Preceding Petition Date

16243608

# I. INTRODUCTION AND SUMMARY

Capitalized terms used in this Disclosure Statement have the same meanings as defined in the Joint Plan and the Bankruptcy Code. Terms defined in this Disclosure Statement which are also defined in the Joint Plan are solely for convenience, and the Joint Plan Proponents do not intend to change the definitions of those terms from the Joint Plan. If any inconsistency exists between the Joint Plan and this Disclosure Statement, the Joint Plan is, and will be, controlling.

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, ALL CAPITALIZED TERMS CONTAINED HEREIN WILL HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT PLAN.

## A. Purpose Of Disclosure Statement

Arizona Eco Development LLC ("Arizona Eco") is the holder of secured and unsecured debt of GDRH, debtor in the above-captioned, jointly-administered bankruptcy case. The Note Holders Committee is an unofficial committee consisting of the following persons: Chris Allen, Greg Stanford, Brad Routh, David Rosenthal, Joe Guglielmi, Robert Seaton, and Robert Olson. The Note Holders Committee represents the interests of persons who purchased convertible promissory notes of Debtor.[1]

The Joint Plan Proponents are furnishing this Disclosure Statement to all Creditors and Equity Holders who are entitled to vote to accept or reject the Joint Plan, which is being concurrently filed herewith. Additionally, a copy of the Joint Plan is attached to this Disclosure Statement as **Exhibit "1."**

The Disclosure Statement is to be used by each such Creditor and Equity Holder solely in connection with evaluation of the Joint Plan. Use of the Disclosure Statement for any other

---

[1] The following persons hold Notes: Chris and Cynthia Allen Family Trust, Joshua Asher, Mark Bartholomew, Bernard Citron Trust, Rod and Tyler Borman, Gary and Barbara Burton, DCQA GRNT Enterprises, Russell Dickey, Don and Evelyn Foley, Gregory Stanford Trust, Joseph Guglielmi, Hubert Ilsley, John & Janet Butterfield Family Trust, Kent C. and Judith A. Mueller, LaBelle Ltd. Partnership, Leebaw Mfg. Co., Lindsay Charitable Remainder, Lobodos Ventures LP, Malcolm D. Ratner Marital Trust, Marketplace One LLC, Michael & Sharon Lechter Revocable Trust, Ninos Trust, NTC & Co., Robert A. and Uthaiwan Olson, RBC Capital Markets, Riley Investments LLC, David P. and Terri A. Rovick, William A. Sands, Schupak Non-Exempt Marital Trust, SPR Trust, Spruce Ave. Ltd. Partnership (now owned by Arizona Eco), Walter & Sylvia Klenz Rev. Trust, Whiteman Family Trust, and WMS Fixed Income Fund I LLC. (The Note Holders Committee is not an official committee appointed by the U.S. Trustee's office).

purpose is not authorized by the Joint Plan Proponents or the Court. The purpose of this Disclosure Statement is to provide "adequate information," as that term is defined in Section 1125 of the Bankruptcy Code, to enable Creditors whose Claims are impaired under the Joint Plan and Equity Holders to make an informed decision regarding whether to accept or reject the Joint Plan. The Joint Plan Proponents believe that this Disclosure Statement contains information that is material, important, and necessary for all such Creditors to arrive at an informed decision in exercising their right to vote for acceptance of the Joint Plan.

---------------------------------

**THE JOINT PLAN PROPONENTS BELIEVE THAT THE JOINT PLAN IS IN THE BEST INTERESTS OF THE CREDITORS. ACCORDINGLY, CREDITORS ENTITLED TO VOTE ON THE JOINT PLAN ARE URGED TO VOTE IN FAVOR OF THE JOINT PLAN. (VOTING INSTRUCTIONS ARE SET FORTH IN ARTICLE IV OF THIS DISCLOSURE STATEMENT.) TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED NO LATER THAN _____, 2013 (THE "<u>VOTING DEADLINE</u>").**

**EACH CREDITOR AND EQUITY HOLDER SHOULD READ THIS DISCLOSURE STATEMENT, THE JOINT PLAN, AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT AND THE JOINT PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE JOINT PLAN.**

**ALL EXHIBITS OR SCHEDULES TO THIS DISCLOSURE STATEMENT ARE ANNEXED HERETO AND SUPPLEMENTED WITH CERTAIN ADDITIONAL MATERIALS. ALL EXHIBITS OR SCHEDULES TO THIS DISCLOSURE STATEMENT OR THE JOINT PLAN MAY BE OBTAINED, ONCE FILED, THROUGH THE BANKRUPTCY COURT'S WEB SITE: https://ecf.azb.uscourts.gov/ WITH A VALID PASSWORD, OR UPON WRITTEN REQUEST TO THE FOLLOWING ADDRESS:**

**SNELL & WILMER** L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
Attention: Claudia Paulsen
E-mail: cpaulsen@swlaw.com

JOINT PLAN PROVISION SUMMARIES AND ALL OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE JOINT PLAN, THE OTHER EXHIBITS AND SCHEDULES HERETO AND THERETO, AND ANY OTHER DOCUMENTS REFERENCED HEREIN OR THEREIN.

IN MAKING A DECISION TO VOTE, CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE JOINT PLAN, INCLUDING THE MERITS AND RISKS INVOLVED AND THE OPINIONS OF THEIR OWN ATTORNEYS OR OTHER ADVISORS.

NEITHER ARIZONA ECO NOR ANY MEMBER OF THE NOTE HOLDERS COMMITTEE NOR ANY OF THEIR ATTORNEYS HAS PROVIDED OR WILL PROVIDE ANY OPINION OR HAS MADE ANY REPRESENTATION IN THIS JOINT PLAN OR IN ANY OTHER DOCUMENT TO ANY PERSON AS TO ANY TAX ISSUES, INCLUDING WHETHER ANY PROVISION OF THE JOINT PLAN WILL ELIMINATE ANY CANCELLATION OF DEBT INCOME TO ANY PERSON. THE JOINT PLAN PROPONENTS ENCOURAGE ALL CREDITORS AND EQUITY HOLDERS TO RETAIN THEIR OWN TAX PROFESSIONALS TO PROVIDE AN OPINION BASED ON EACH SUCH PERSON'S INDIVIDUAL CIRCUMSTANCES.

CREDITORS AND EQUITY HOLDERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING OR RENDERING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH CREDITOR AND EQUITY HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONTEMPLATED THEREBY.

**B.** **Limitations On Information Contained In Disclosure Statement**

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified, and the delivery of this Disclosure Statement will not, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof.

Any estimates of Claims and Interests set forth in this Disclosure Statement may vary from the amounts of Claims or Interests ultimately Allowed by the Bankruptcy Court. The summaries of the Joint Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Joint Plan itself, the Exhibits thereto, and all documents described therein. The information contained in this Disclosure Statement, including, but not limited to, the information regarding the history, business, and operations of the Debtor, the historical financial information of the Debtor, and the liquidation analysis, is included herein for purposes of soliciting acceptances of the Joint Plan. AS TO CONTESTED MATTERS, HOWEVER, THE INFORMATION IN THE DISCLOSURE STATEMENT IS NOT TO BE CONSTRUED AS ADMISSIONS OR STIPULATIONS BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

The financial information regarding the Debtor, including the assets and the liabilities of the Debtor, has been derived from numerous sources including, but not limited to, the Debtor Disclosure Statement (defined below), the Debtor's schedules of assets and liabilities and statements of financial affairs, proofs of Claim, and other documents filed with the Bankruptcy Court. The information contained herein has not been audited and is accurate to the best of the Joint Plan Proponents' knowledge, information and belief. The Joint Plan Proponents and their respective professionals do not know whether any of the information obtained from Debtor or documents filed by Debtor is accurate or true and cannot and do not warrant or represent that the information contained in this Disclosure Statement is without inaccuracy.

The approval by the Bankruptcy Court of the Disclosure Statement does not constitute an endorsement by the Bankruptcy Court of the Joint Plan or a guaranty of the accuracy and completeness of the information contained herein.

16243608

**C.**     **Order Governing Plan Confirmation Process**

On _____, 2013, the Bankruptcy Court entered its order (i) approving this Disclosure Statement as containing "adequate information" pursuant to 11 U.S.C. § 1125 of the Bankruptcy Code, (ii) fixing _____, **2013** as the deadline for filing and serving any objections to Confirmation of the Joint Plan, (iii) fixing _____, **2013** as the deadline for voting to accept or reject the Joint Plan, and (iv) setting _____, **2013**, **at __:___ __.m.** M.S.T. (Arizona Time) as the date and time for a preliminary hearing on the confirmation of the Joint Plan. The final hearing will be set by the Bankruptcy Court at the preliminary hearing. No separate notice of the final hearing date necessarily will be served unless otherwise ordered by the Court.

Section 1128(b) of the Code provides that any party in interest may object to confirmation of a plan. Any objection(s) to confirmation of the Joint Plan must be in writing, must state with specificity the grounds for any such objections, and must be filed with the Bankruptcy Court and served upon the following parties so as to be received on or before the time fixed by the Bankruptcy Court:

> **United States Trustee:**
> OFFICE OF THE UNITED STATES TRUSTEE
> 230 N. First Avenue, Suite 204
> Phoenix, AZ 85003-1706
> Telephone Number: (602) 682-2600
> Attn: **Larry Lee Watson**
> E-mail: larry.watson@usdoj.gov
>
> **The Joint Plan Proponents:**
> SNELL & WILMER L.L.P.
> One Arizona Center
> 400 East Van Buren
> Phoenix, AZ 85004-2202
> Telephone Number: (602) 382-6000
> Attn: **Donald L. Gaffney**
> E-mail: dgaffney@swlaw.com
>
> TIFFANY & BOSCO, P.A.
> Third Floor, Camelback Esplanade II
> 2525 East Camelback Road
> Phoenix, AZ 85016-4237
> Telephone Number: (602) 255-6000
> Attn: **Christopher R. Kaup**
> E-mail: crk@tblaw.com

## II.    INFORMATION REGARDING JOINT PLAN AND DISCLOSURE STATEMENT

If practical, a Chapter 11 case attempts to proceed to the confirmation (*i.e.*, approval by the Bankruptcy Court) of a plan of reorganization. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and interests in a debtor. After a plan has been filed, most holders of such claims and interests are permitted to vote to accept or reject the plan. Before a plan proponent can solicit acceptances of a plan, 11 U.S.C. § 1125 requires the plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor and the Joint Plan to enable you to make an informed decision in exercising your right to accept or reject the Joint Plan. The Bankruptcy Court has already conditionally approved[2] *Debtor's Consolidated Disclosure Statement to Accompany Plan of Reorganization Dated September 26, 2012* filed by the Debtor ("Debtor Disclosure Statement") and *Tri-City's Consolidated Supplemental Disclosure in Support of Tri-City's Plan As Amended* filed by Tri-City Investment & Development, LLC ("Tri-City Disclosure Statement") (collectively, the "Approved Disclosure Statements"). Copies of the Approved Disclosure Statements[3] are located at Dkt. Nos. 326 and 329 and may be received upon contacting Claudia Paulsen of Snell & Wilmer L.L.P., at cpaulsen@swlaw.com. Therefore, the Joint Plan Proponents reference both Approved Disclosure Statements in this Disclosure Statement and only provide additional information as is needed to explain the Joint Plan.

This Disclosure Statement will be used to solicit acceptances of the Joint Plan only after the Bankruptcy Court has entered an order approving this Disclosure Statement. Bankruptcy

---

[2] *See Minute Entry/Order Matter Taken Under Advisement* Dated November 15, 2012 ("Under Advisement Order"), at Dkt. No. 411.

[3] The Debtor and Tri-City Investment & Development, LLC ("Tri-City") have subsequently filed amended versions of the Approved Disclosure Statements, the most recent of which are located at Dkt. Nos. 456 and 455, respectively. An order approving these amended versions of the Debtor Disclosure Statement and Tri-City Disclosure Statement was lodged on December 10, 2012 (*see* Dkt. No. 460); however, neither the Debtor nor Tri-City is proceeding with its respective plan at this time.

Court approval of this Disclosure Statement means only that the Bankruptcy Court has found that this Disclosure Statement meets the statutory requirement of 11 U.S.C. § 1125 to provide adequate information. Such approval by the Bankruptcy Court is not an opinion or ruling on any other merits of this Disclosure Statement. It does not mean that the Joint Plan has been approved, or will be approved, by the Bankruptcy Court.

After this Disclosure Statement has been approved by the Bankruptcy Court and voting on the Joint Plan has been completed, a hearing on the Joint Plan will be held to determine whether the Joint Plan should be confirmed. At the hearing, the Bankruptcy Court will consider whether the Joint Plan satisfies the various requirements of the Code. The Bankruptcy Court also will receive and consider a Ballot Report prepared by the Joint Plan Proponents which will present a tally of the votes accepting or rejecting the Joint Plan cast by those entitled to vote. Once confirmed, the Joint Plan is treated as a contract and is binding on all Creditors, holders of equity interests, and other parties-in-interest in the Debtor's bankruptcy case.[4]

THIS DISCLOSURE STATEMENT IS NOT THE JOINT PLAN. FOR THE CONVENIENCE OF CREDITORS AND EQUITY HOLDERS OF THE DEBTOR, THE JOINT PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE JOINT PLAN ITSELF. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE JOINT PLAN, THE JOINT PLAN WILL CONTROL.

The Bankruptcy Court will hold a hearing on confirmation of the Joint Plan, and, before that hearing, the Ballot Report will be prepared and filed with the Bankruptcy Court. Accordingly, all votes are important because they can determine whether the Joint Plan will be confirmed.

---

[4] As of this date, none of the plan proponents of the three separate plans of reorganization proposed in the Debtor's case had obtained formal stay relief in the CMS Bankruptcy Case (defined below), although each plan proposes to impair or terminate CMS' equity interests in GDRH. A form of stipulated order stating that the automatic stay in the CMS Bankruptcy Case does not apply to the GDRH plan process has been lodged with the Court. *See* Dkt. No. 530.

## A.    Summary Of The Joint Plan

The Joint Plan proposes that two parcels of real property, a 108-acre parcel and a 17-acre parcel, specifically identified on the map attached to the Joint Plan as Exhibit "2(a)," (the "Note Holders' Parcels"), along with all related rights and interests, will be transferred free and clear of all liens, claims, and encumbrances to a new entity, NH Co. LLC, which will be owned entirely by the Note Holders, subject only to certain limitations.  Additionally, all preference Claims against non-insiders, pursuant to 11 U.S.C. § 547, and the option to acquire any Notes from Arizona Eco which it has purchased, will be transferred or provided to NH Co. LLC.  Any Note Holder will have the option to be paid an amount equal to 10% of the original principal amount, or the existing balance due to the Note Holder as of the Petition Date, whichever is less, of his, her, or its Claim by selling his, her, or its Note to Arizona Eco or another Note Holder for an amount equal to 10% of the principal amount of his, her, or its Note.  In order to elect that option, a Note Holder must check the appropriate box on the Ballot, a copy of which is attached hereto as **Exhibit "2."**

Additionally, each Note Holder electing Option A (described below) shall have a right, ahead of Arizona Eco, to purchase any other Note held by any other Note Holder and the distributions to be made to that Note Holder under this Joint Plan on a first come first served basis.  The Ballot Report will report all Note Holders who have elected Option A, Option B, or who have not made an election, and therefore defaulted to Option A.  Once the Ballot Report is filed, any Option A Note Holder may notify counsel for the Joint Plan Proponents prior to the beginning of the hearing on Confirmation of the Joint Plan of their intention to purchase an Option B Note.

The Note Holders Committee and Arizona Eco have agreed that Arizona Eco and NH Co. LLC shall share the responsibility for any deficit to pay the Allowed Administrative Claims of the Estate, with Arizona Eco to be responsible to pay 65% of that amount and NH Co. LLC to be responsible to pay 35% of that amount, with a cap in the amount of $450,000.00 on the amount allocated to be paid by NH Co. LLC.  Arizona Eco has agreed to and shall advance the funds necessary to pay the portion of Allowed Administrative Claims allocable to NH Co. LLC.

Arizona Eco shall be repaid the amount it advances to NH Co. LLC for that purpose from the first proceeds from the sale of the Note Holders' Parcels, plus interest at the rate of 8% *per annum*. NH Co. LLC shall have the right to (i) pay its allocated portion of the Allowed Administrative Claims directly to the holder of any Allowed Administrative Claim in order to avoid the 8% interest on funds advanced by Arizona Eco to pay those Claims; and (ii) repay any amount advanced by Arizona Eco to pay such Claims at any time in order to stop the accrual of interest in favor of Arizona Eco.

All other property and property interests of the Estate are to be transferred and/or foreclosed upon by Arizona Eco or its designee, except that suits and Claims held or owned by the Estate against any member of the Cavan Group will be transferred to and may be pursued by Arizona Eco or its nominee, with any net recoveries to be paid 80% to Arizona Eco and 20% to NH Co. LLC.[5]

All other general Unsecured Claims shall be paid 10% of their principal amount if or when Allowed by a Final Order of the Court, and Claims shall be paid when finally Allowed; however, Arizona Eco agrees as part of the proposed Joint Plan to not assert any unsecured deficiency Claim in the General Unsecured Class, except as a set-off against any Claim held by any member of the Cavan Group.

The operating agreement of NH Co. LLC will contain a provision stating that a majority of Note Holders not affiliated with Arizona Eco, the Cavan Group, and the Debtor will be required to approve the sale of land owned by NH Co. LLC. A true and correct copy of the Operating Agreement of NH Co. LLC is attached hereto as **Exhibit "3."**

The equity interests are terminated under the Joint Plan and do not receive payment.

## III.   <u>LIMITATIONS ON REPRESENTATIONS</u>

Other than as stated in this Disclosure Statement, the Joint Plan Proponents have not authorized any representations or assurances concerning the Debtor or the value of its assets. Therefore, in deciding whether to accept or reject the Joint Plan, you should not rely on any

---

[5] Arizona Eco may, with the consent of the Note Holders, determine prior to the Effective Date to allow documents or causes of action, to remain within the GDRH entity, subject to the procedures and control of Arizona Eco.

information relating to the Debtor or the Joint Plan other than that contained in this Disclosure Statement (including the Approved Disclosure Statements, where referenced), or in the Joint Plan itself. You should report any unauthorized representations or inducements to counsel for the Joint Plan Proponents:

> Donald L. Gaffney
> Snell & Wilmer L.L.P.
> One Arizona Center
> 400 E. Van Buren
> Phoenix, Arizona 85004-2202
> E-mail: dgaffney@swlaw.com
>
> Christopher R. Kaup
> Tiffany & Bosco, P.A.
> Third Floor, Camelback Esplanade II
> 2525 East Camelback Road
> Phoenix, AZ 85016-4237
> E-mail: crk@tblaw.com

Joint Plan Proponents' counsel may present any such information regarding representations and/or inducements to the Bankruptcy Court for such action as may be appropriate.

This is a solicitation by the Joint Plan Proponents only and is not a solicitation by its attorneys, agents, financial advisors, accountants, or any other professionals employed by the Joint Plan Proponents.

## IV. VOTING PROCEDURES AND REQUIREMENTS

### A. Who Is Entitled To Vote

If you are the holder of an Allowed Claim which is "impaired" under the Joint Plan, you are entitled to vote to accept or reject the Joint Plan. Accordingly, to be entitled to vote, your Claim must be both "allowed" and "impaired."

#### 1. Allowed Claims

You have an Allowed Claim if: (i) you timely filed a proof of claim and no objection has been filed to your Claim; (ii) you timely filed a proof of claim and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim; (iii) your Claim is listed by the Debtor in its Schedules, which are on file with the Bankruptcy Court as a public record, as liquidated in amount, noncontingent as to liability and undisputed and no objection has

10

16243608

been filed to your Claim; or (iv) your Claim is listed by the Debtor in its Schedules as liquidated in amount, noncontingent as to liability and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim. If your Claim is not an Allowed Claim, it is a Disputed Claim, and you will not be entitled to vote on the Joint Plan unless the Bankruptcy Court temporarily or provisionally allows or estimates your Claim for voting purposes pursuant to Bankruptcy Rule 3018. **IF YOU ARE UNCERTAIN REGARDING THE STATUS OF YOUR CLAIM, YOU SHOULD CHECK THE BANKRUPTCY COURT RECORD CAREFULLY, INCLUDING THE SCHEDULES OF THE DEBTOR. YOU SHOULD SEEK APPROPRIATE LEGAL ADVICE IF YOU HAVE ANY DISPUTE WITH THE DEBTOR. THE JOINT PLAN PROPONENTS AND THEIR PROFESSIONALS ARE POTENTIALLY ADVERSE PARTIES AND CANNOT ADVISE YOU ABOUT SUCH MATTERS.**

### 2.      Impaired Claims

Claims and Interests are "impaired" when the full amounts of the Allowed Claims will not be paid under the Joint Plan, no distributions will be made on account of the Allowed Interests, or when the holder's legal, equitable, or contractual rights are otherwise altered by the Joint Plan. Creditors and Equity Holders who are not "impaired" under the Joint Plan are deemed to have accepted the Joint Plan pursuant to 11 U.S.C. § 1126(f), and their acceptances of the Joint Plan need not be solicited.

### B.      Procedures For Voting

### 1.      Submission Of Ballots

All Creditors whose votes are solicited will be sent a Ballot, together with instructions for voting, with a copy of this Disclosure Statement as approved by the Bankruptcy Court and a copy of the Joint Plan. You should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot which was sent with this Disclosure Statement. You should complete your Ballot and return it to **Snell & Wilmer L.L.P., Attn: Claudia Paulsen,** One Arizona Center, 400 E. Van Buren, Phoenix, Arizona 85004-2202 (cpaulsen@swlaw.com), with a copy to **Tiffany & Bosco, P.A., Attn: Lou Lofredo,** Camelback Esplanade II, Third Floor, 2525 East

Camelback Road, Phoenix, Arizona 85012 (lal@tblaw.com). Ballots returned by e-mail will be accepted; ballots returned by facsimile are not valid and will not be counted.

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY _____, 2013.**

**Ballots received after the Voting Deadline will not be counted. Ballots should not be delivered directly to the Joint Plan Proponents, the Court, or the Office of the United States Trustee.**

### 2. Incomplete Ballots

Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Joint Plan has not been indicated, will not be counted as a vote on the Joint Plan.

### 3. Withdrawal Of Ballots

A Ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

### 4. Questions And Lost Or Damaged Ballots

If you have any questions concerning voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Claudia Paulsen at the address, telephone number and e-mail address listed above.

### C. Summary Of Voting Requirements

For the Joint Plan to be confirmed, the Joint Plan must be accepted by at least one impaired class of Claims. For a class of Claims to vote to accept the Joint Plan, votes representing at least two-thirds (2/3) in amount and a majority in number of the Claims voted in that class must be cast for acceptance of the Joint Plan. As more fully described in Article VII of this Disclosure Statement, the Joint Plan Proponents are seeking acceptances from holders of Allowed Claims in the following classes, which are, or may be, "impaired" under the Joint Plan, provided, however that the Joint Plan Proponents will have the right to supplement this Disclosure Statement as to any other impaired classes, if any.

| Class | Description |
|---|---|
| Class 2 | Secured Claim of Arizona Eco |
| Class 5 | General Unsecured Claims |
| Class 6 | Note Holders |

**IT IS IMPORTANT THAT HOLDERS OF ALLOWED IMPAIRED CLAIMS EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE JOINT PLAN.**

The specific treatment of each Class under the Joint Plan is described in the Joint Plan and is summarized in Article VII of this Disclosure Statement. A more detailed description of confirmation requirements and related issues is discussed in Article XI of this Disclosure Statement.

Section 1129(b) of the Code provides that if the Joint Plan is rejected by one or more impaired classes of Claims, the Joint Plan (or any modification thereof) nevertheless may be confirmed by the Court if it determines that the Joint Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes of Claims impaired under the Joint Plan.[6]

A VOTE FOR ACCEPTANCE OF THE JOINT PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS VERY IMPORTANT. THE JOINT PLAN PROPONENTS ASSERT THAT THE TREATMENT OF CREDITORS UNDER THE JOINT PLAN IS THE BEST ALTERNATIVE FOR CREDITORS AND THE JOINT PLAN PROPONENTS RECOMMEND THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE JOINT PLAN. SPECIFICALLY, THE NOTE HOLDERS COMMITTEE BELIEVES THAT THE TREATMENT OF AND RETURN TO NOTE HOLDERS UNDER THE JOINT PLAN IS SUBSTANTIALLY BETTER AND LESS RISKY FOR THE NOTE HOLDERS THAN THE TREATMENT AND RETURN PROPOSED IN THE TRI-CITY PLAN AND THE DEBTOR PLAN (DEFINED BELOW).

---

[6] The Joint Plan proposes to terminate the Equity Interests, which, under applicable Code provisions, renders holders of Equity Interests a rejecting class and non-voting.

16243608

13

# V. BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING

## A. The Debtor And Its Property

The Approved Disclosure Statements provide comprehensive background information about the Debtor and its property. The following is an excerpt from pages 17 - 20 of the Debtor Disclosure Statement:

Debtor is a limited liability company organized under the laws of Arizona, formed on July 14, 2004. Its members are as follows: Cavan Management Services, LLC ("**CMS**") as member and manager, and Tri-City Investment & Development, LLC ("**Tri-City**"); Granite Dells Equity Group, LLC ("**GDEG**") and Granite Dells Investors, LLC ("**GDI**"), as additional members.[7]

\*\*\*

Debtor has granted conversion rights to certain holders of promissory notes issued by Debtor to Persons interested in investing in Debtor's business. The holders of these conversion rights, if exercised, would be entitled to convert their notes to equity interests through GDI and the resulting dilution of equity interests would be divided among CMS and Tri-City. As a result, current equity interests and fully diluted interests (assuming 100% exercise of conversion rights) are as follows:[8]

| MEMBERS OF DEBTOR | | |
|---|---|---|
| **Member** | **Current %** | **Diluted %** |
| CMS | 39.25% | 31.50% |
| Tri-City | 39.25% | 31.50% |
| GDEG | 6.00% | 6.00% |
| GDI | 15.50% | 31.00% |
| Total | 100.00% | 100.00% |

Tri-City is a limited liability company organized under the laws of Arizona, formed on September 12, 2001. In 2004, Tri-City entered into an agreement with the Original Owners to acquire the Property. Shortly thereafter, Tri-City was unable to make the payments provided for in the agreement or otherwise comply with the agreement and sought the assistance and participation of CMS to provide funding and other assistance in connection with the acquisition of the Property. CMS and its affiliates provided funds and expertise and, in 2005, the Tri-City operating agreement was modified to add Cavan Prescott Investors, LLC as a member of Tri-City. In May 2006, Tri-City assigned its rights under the Original Owner agreement to Debtor, which completed and closed the purchase of the Property in exchange for its equity interest in the Debtor. GDEG and GDI received equity interests in Debtor in exchange for funds provided to fund the acquisition of the Property. The members agreed that the equity share of CMS

---

[7] *See* Debtor Disclosure Statement at p. 17:8-12.

[8] Testimony and documents of the Debtor's officers and former employees have indicated some confusion over these ownership percentages.

and Tri-City would be diluted in exchange for additional capital contributions to the extent made by GDI. Currently, the members of Tri-City, and their respective equity interests in Tri- City are as follows:

| MEMBERS OF TRI CITY | |
|---|---|
| **Member** | **Current %** |
| RKS Inc. or Robert Stewart (*sic*) Swanson | 11.01635% |
| Nancy O. Swanson Family LP | 13.09350% |
| Michael W. Fann | 13.26979% |
| Tack Family LLC(Arnold) | 13.26979% |
| Ranchvest, LLC | 8.53839% |
| Madison Land Company, LLC | 2.8830% |
| Erickson Family Trust | 13.26979% |
| Othmar Iseli | 9.65909% |
| John F. Whitney | 1% |
| Hays Revocable Living Trust | 1.5% |
| Sullins Revocable Trust | 1.% |
| Levy Family Trust | 1.% |
| Cavan Prescott Investors, LLC | 10.5% |
| Total | 100.00% |

Debtor is the owner of the Property, which is depicted on Exhibit 2. The Property lies within an overall area approximately 4 miles wide by 10 miles long. The Property borders the City of Prescott on the west and southwest, the Town of Prescott Valley on the east and southeast, and Chino Valley on the north. The Property contains a variety of pristine views, including dramatic granite rock formations in the "Dells," located in the southwest area of the property. The Property was purchased for $107,000,000 in May of 2006. Debtor paid $21,400,000 at closing[9] and executed a purchase note in the amount of $83,220,534 to the Sellers: Granite Dells Ranch of Yavapai County Arizona, Inc., and Point of Rocks Ranch Company, Inc. (the "Original Owners") for the balance of the purchase price (the "Note"). The Note is secured by the Deed of Trust filed against the Property and a Partial Collateral Assignment of License Agreement for the extraction of aggregates with Hanson Aggregates of Arizona, Inc., referred to herein as the mining lease.

In 2007 the City of Prescott ("City") was prepared to design and construct a new traffic interchange at the intersection of Highway 89A freeway and Side Road on the western edge of the Property. Pursuant to an existing development agreement, the City had an obligation to build the interchange to provide freeway access to a development called Centerpoint East. Had the interchange been built where originally planned, the Property would have had limited direct access to the interchange. Through a series of meetings and negotiations with the City, the

---

[9] The $21.4 million was, in fact, a back-to-back escrow in which a portion of the original property was sold at the moment of acquisition. The Debtor itself only acted as a conduit for the $21.4 million advanced by a separate buyer.

16243608

Manager of Debtor convinced the City to move the interchange approximately one-half mile to the east. This placed the interchange in the center of a section of the Property located a short distance south and east of the Prescott Airport. As part of the negotiations, Debtor agreed to donate the land that would be required for the interchange, rather than paying a portion of the construction cost.[10]

**B.**    <u>Pre-Bankruptcy Events</u>

The following is an excerpt from pages 1 - 2 of the Debtor Disclosure Statement:

> … Debtor intended to obtain entitlements for the Property and then develop and subdivide the Property for mixed residential and commercial use. Debtor's development plans were significantly delayed by a sharp downtown in real estate values in the state and nationwide occurring from 2007 through 2011.[11]
>
> ***
>
> In 2008, however, Debtor had insufficient funds to continue payments on the seller carryback note. Debtor and the sellers thereafter negotiated a number of extensions and restructuring of the note and successfully avoided legal action through 2010.[12]  In 2011, Debtor and the sellers continued their negotiations, seeking to agree to a significant principal reduction that would permit Debtor to pay the sellers the reduced amount through a re-financing.
>
> In January 2012, the sellers instead sold the note to Arizona Eco Development, LLC ("AED"), an Arizona limited liability company formed by Robert Stuart Swanson for the purpose of acquiring the note. Thereafter, AED commenced proceedings for a trustee sale and, shortly thereafter, commenced judicial proceedings for the appointment of a receiver. These chapter 11 proceedings were commenced shortly after AED initiated the judicial and trustee sale proceedings.[13]

**C.**    <u>Prepetition And Postpetition Management Of The Debtor</u>

The Debtor has been controlled by and through its manager CMS, which, in turn, was controlled by Mr. David Cavan ("Mr. <u>Cavan</u>"). On October 30, 2012, the Court entered an *Order Authorizing Avion Holdings LLC to Act as Designated Representative of GDRH* [Dkt. No. 374], designating Avion Holdings LLC ("<u>Avion</u>"), by and through G. Neil Elsey, as manager for the Debtor. As set forth in detail below, in Section VI(E), CMS filed a petition for relief under Chapter 11 of the Code on September 11, 2012.

---

[10] *See* Debtor Disclosure Statement at p. 17:18-23 - 20:1-18 (headings and footnotes omitted). The nature and extent of the manager of Debtor's activities is an issue of dispute.
[11] *See* Debtor Disclosure Statement at p. 1:26 – 2:1-4.
[12] By the beginning of 2009, the Debtor defaulted on all of its convertible promissory Notes, as well as the seller carry-back note. Several Note Holders have sued GDRH since the general default in early 2009. In November 2009, the sellers issued their own formal default notice. All extensions with the sellers had expired prior to 2011.
[13] *See* Debtor Disclosure Statement at p. 2:9-20.

## VI.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    Commencement Of The Chapter 11 Case

On March 13, 2012 ("Petition Date"), CMS, purportedly as manager of GDRH, caused to be filed, on behalf of Debtor, a petition for relief under Chapter 11 of the Code.  The Case was assigned to the Honorable Redfield T. Baum, United States Bankruptcy Judge for the District of Arizona.  Since the Petition Date, the Debtor has continued to operate its business as debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors has been appointed by the Office of the United States Trustee; however, the Note Holders Committee and the Unofficial Ad Hoc Equity Holders' Committee ("Equity Holders Committee"),[14] which are "unofficial" committees, have been formed and have participated in Debtor's case.

### B.    Employment Of Professionals

As of the date of this Disclosure Statement, the Bankruptcy Court has entered orders authorizing the Debtor to retain the following professionals: Stinson Morrison Hecker LLP ("SMH") as general bankruptcy counsel under Section 327(a) of the Code [*see* Dkt. No. 94], Gregory W. Huber, P.C. ("Huber") as special real estate counsel [*see* Dkt. No. 93], Cohen Kennedy Dowd & Quigley ("CKDQ") as special litigation counsel [*see* Dkt. No. 99], Avion as designated representative [*see* Dkt. No. 374], and Keegan Linscott & Kenon PC ("KLK") as accountant and financial advisor [*see* Dkt. No. 414].  Hereinafter, SMH, Huber, CKDQ, Avion, and KLK will be referred to as "Debtor's Professionals."  To date, the Bankruptcy Court has allowed fees to Debtor's Professionals on an interim basis in the total amount of $626,320.97.[15]

---

[14] The Ad Hoc Equity Holders Committee is comprised of a sub-group of investors in Granite Dells Investors, LLC ("GDI") and Granite Dells Equity Group Investors, LLC ("GDEG"), which are two of the four equity members of the Debtor.

[15] *See* Dkt. Nos. 404, 405 and 407.  This amount does not include deductions for applied pre-petition retainers paid to Debtor's Professionals.  All fee approvals are interim only, and the Debtor's Estate is currently administratively insolvent.  The Debtor recently filed fee applications for SMH, CKDQ, Huber, KLK and Avion (*see* Dkt. Nos. 532-535, 539) for fees incurred between July 1, 2012 and December 31, 2012, in the total amount of $638,844.18. The Court will consider these fee applications at a hearing on February 21, 2013.

## C.    Arizona Eco's Stay Relief Motions And Motion To Dismiss

On March 16, 2012, Arizona Eco filed its *Motion for Stay Relief Regarding 15,000 Acres of Rural Real Property Located Near Prescott, Prescott Valley, and Chino Valley, Arizona* [Dkt. No. 11] (together with the Reply filed in support, at Dkt. No. 67, the "First Stay Relief Motion"), on the grounds that CMS lacked corporate authority to file Debtor's case, and filed the same in bad faith as the operating agreement of GDRH required unanimous written consent of all five executive committee members of the Debtor. On June 13, 2012, Arizona Eco filed its *Motion for Stay Relief Regarding 15,000 Acres of Rural Real Property Located Near Prescott, Prescott Valley, and Chino Valley, Arizona Pursuant to 11 U.S.C. § 362(d)(3)* [Dkt. No. 143] (together with the reply filed in support, at Dkt. No. 183, the "Second Stay Relief Motion"). On June 27, 2012, Arizona Eco filed its *Motion to Dismiss Case and Request for Hearing Pursuant to 11 U.S.C. § 1112(b)(3)* [Dkt. No. 167] (together with the reply filed in support, at Dkt. No. 202, the "Motion to Dismiss") in the Chapter 11 Case under Section 1112 of the Bankruptcy Code, incorporating the prior two motions for stay relief. All three motions were consolidated for trial on August 28, 2012. The Court denied these motions in its ruling of October 18, 2012 [*see* Dkt. No. 362], and its subsequent order entered on October 31, 2012 [*see* Dkt. No. 376], ruling that the filing of a plan by Tri-City later in the proceedings "ratified" the Chapter 11 petition, notwithstanding the negative votes by two of the Debtor's executive committee members. The order denying the First Stay Relief Motion, the Second Stay Relief Motion, and the Motion to Dismiss was appealed to the District Court on November 14, 2012 [*see* Dkt. No. 408], where it is due to be briefed in March 2013.

## D.    Debtor's Allegations as to Arizona Eco[16]

### 1.    Debtor's Litigation Against Arizona Eco

On August 24, 2012, Debtor filed its complaint entitled *Objection to AED's Claim and Complaint for Equitable Subordination,* initiating Adv. No. 2:12-ap-01515 ("Subordination Suit"). The complaint seeks subordination of Arizona Eco's Claim for $127,337,491.91 and

---

[16] Section VI(D) consists of Arizona Eco's analysis and opinion regarding the Debtor's litigation against Arizona Eco, and does not reflect the views or opinion of any other party, including the Note Holders Committee.

1    requests that the beneficial interest of Arizona Eco be limited to the amount Arizona Eco paid to

2    acquire the Claim.  Also on August 24, 2012, Debtor filed a complaint against Mr. Stuart

3    Swanson and Mr. Jason Gisi, principals of Arizona Eco, as well as Mr. Michael Fann, who is not,

4    thereby initiating Adv. No. 2:12-ap-01519 ("Constructive Trust Suit").  The Debtor has described

5    this suit as seeking:

6                     monetary recovery and equitable relief based upon fraud, breach of
                     fiduciary duty, constructive trust, tortious interference with
7                     business expectancy, breach of contract, breach of the implied
                     covenant of good faith and fair dealing, aiding and abetting fraud,
8                     aiding and abetting breach of fiduciary duty, and negligent
                     misrepresentation.  The Constructive Trust Complaint also seeks a
9                     declaration that Swanson acquired the promissory note in
                     constructive trust for Debtor, and also seeks compensatory and
10                    punitive damages.

11           To date, the Constructive Trust Suit complaint has not yet been served on Mr. Swanson,

12   and the original summons has lapsed.  On September 26, 2012, Arizona Eco, in the Subordination

13   Suit, and Mr. Gisi, in the Constructive Trust Suit, moved to withdraw their respective proceedings

14   to the United States District Court for the District of Arizona ("District Court").  Also on that

15   date, Arizona Eco moved to strike the Claim objection portion of the Subordination Suit, and Mr.

16   Gisi moved to dismiss the Constructive Trust Suit for its failure to name an indispensable party,

17   specifically Arizona Eco.  On December 28, 2012, the District Court granted withdrawal and the

18   parties are to proceed with pre-trial following an extension through early February 2013.

19           Copies of the complaints for the Subordination Suit and the Constructive Trust Suit are

20   attached hereto as **Exhibits "4"** and **"5,"** respectively.   Both suits make identical factual

21   allegations.   Arizona Eco submits that the Debtor has failed to disclose certain material

22   documents:

23                    1.      On October 26, 2011, Mr. Swanson informed Mr.
             Cavan that he had spoken directly to representatives of the Original
24           Owners, and Mr. Cavan responded stating that it had been the right
             approach.  *See* **Exhibit "7"** attached hereto.
25
                     2.      After Mr. Swanson had ceased negotiations with
26           Mr. Cavan, Mr. Cavan and the Original Owners' representative,
             Mr. David Combs, reached a deal for GDRH to purchase the carry-
27           back note by December 16, 2011.  *See* **Exhibit "8"** attached
             hereto.
28

3.     When Mr. Cavan informed Mr. Combs that he could not close the transaction due to lack of funds and needed an extension until February 28, 2012, Mr. Combs terminated their deal on December 16, 2011. *See* **Exhibit "9"** attached hereto.

4.     After this termination, Mr. Swanson was then contacted by the Original Owners' representative on December 18, 2011, and asked if Mr. Swanson would be interested in acquiring the note independently. *See* **Exhibit "10"** attached hereto. The Original Owners then requested a limited confidentiality agreement with Mr. Swanson. *See* **Exhibit "11"** attached hereto. Mr. Swanson formed Arizona Eco as the corporate entity to acquire the note; the purchase of which closed in January 2012. Immediately following the closing, Mr. Gisi requested and then held a conference call with Mr. Cavan and his group to see if some resolution could be obtained without the necessity of foreclosure and collection proceedings. *See* **Exhibit "12"** attached hereto. No settlement could be reached between the parties.

In light of these and other missing documents, Arizona Eco believes that the premise of the Debtor's complaints against Arizona Eco and other Defendants has no factual basis, even without reviewing the additional legal obstacles presented.

## 2.     <u>Additional Disclosures Requested By Debtor</u>

The Debtor, during its period of direct management by the Cavan Group, asserted that Arizona Eco is an "insider" of GDRH. Arizona Eco believes that this assertion is incorrect and is refuted by the Debtor's own Disclosure Statement, which shows that Mr. Swanson and his extended family at most hold a minority interest in Tri-City (11.01% and 13.09%, respectively), which in turn holds a minority interest (31.5%) in the Debtor GDRH. *See* Section V(A) above. Moreover, the GDRH Operating Agreement allowed for no control of the Debtor entity other than by the Cavan Group members, Mr. David Cavan, and Mr. G. Denny Matthew.

For further clarification requested by the Debtor, Arizona Eco and its principal Mr. Swanson, and its officer, Jason Gisi, have not promised any money, property, or other consideration to Tri-City or its members ("<u>Tri-City Group</u>") in connection with this proposed Joint Plan and have not promised the Tri-City Group some type of consideration following confirmation. There have, however, been negotiations on the Tri-City Plan[17] and negotiations

---

[17] While Arizona Eco agreed to support the Tri-City Plan, that plan did not receive indications of sufficient support to proceed to confirmation.

regarding Tri-City's possible inclusion alone or with other equity groups under a possible amendment of this Joint Plan that would then be presented to the Court, but only in the context of a plan of reorganization. These proposals involved offers to Tri-City to purchase various parcels of the Real Property at certain prices, with seller financing. To be specific, at various times over the course of the Debtor's case Tri-City has initiated talks to buy commercial land along Highway 89A, in Prescott Valley, Prescott, Parcel 33, and Chino Valley at concessional pricing as part of a settlement. Arizona Eco has responded positively to some of these proposals individually, in writing and/or verbally. However, most of these proposals are no longer on the table or under consideration.

Additionally, Mr. Swanson and his family did contribute, *pro rata* and according to their equity interests in Tri-City, along with other members of Tri-City, to the retention of the law firm Mesch, Clark & Rothschild P.C. for Tri-City's representation in these proceedings; however, Mr. Swanson and his family are not and have not been the client representative of Tri-City.

At the request of the Debtor, the Joint Plan Proponents have attached hereto as **Exhibit "14"** a document that contains additional assertions of the Debtor on the subject of Arizona Eco and Mr. Swanson. The Joint Plan Proponents submit that Debtor's statements contained in **Exhibit "14"** are incorrect and, on several factual and legal points, are contradicted by specific documents.

**E.      The CMS Bankruptcy Case And Joint Administration**

On September 11, 2012, the day before the hearing set on a receivership complaint filed by Arizona Eco in state court, CMS filed a petition for relief under Chapter 11 of the Bankruptcy Code, initiating Case No. 2:12-bk-20222-CGC ("CMS Bankruptcy Case"). Arizona Eco filed an *Emergency Motion to Appoint a Chapter 11 Trustee* in the CMS Bankruptcy Case [*see* CMS Bankruptcy Case at Dkt. No. 4] ("Trustee Motion"), alleging, among other things, that CMS has systematically attempted to shelter its assets from its creditors and the creditors of its affiliated entities by stripping away value from CMS in the weeks leading up to the filing of the CMS Bankruptcy Case. The Court has not yet ruled on Arizona Eco's Trustee Motion. On September 12, 2012, counsel for the Debtor filed a *Motion for Joint Administration* [Dkt. No.

21

287] ("Joint Administration Motion"), seeking to jointly administer Debtor's Chapter 11 Case with the CMS Bankruptcy Case. Arizona Eco, among others, filed an objection to the Joint Administration Motion. *See* Dkt. No. 295; *see also* Dkt. Nos. 324 and 325. On September 26, 2012, the Bankruptcy Court issued a memorandum decision granting the Joint Administration Motion, *see* Dkt. No. 330, and on October 10, 2012 the Court entered an order [*see* Dkt. No. 347] granting same. On October 26, 2012, Arizona Eco filed a *Verified Complaint for Preliminary Injunction and Application for Temporary Restraining Order* against Mr. Cavan, initiating Adv. No. 2:12-ap-01842-RTBP ("Cavan Adversary"). In the Cavan Adversary, Arizona Eco seeks a temporary restraining order and preliminary injunction enjoining Mr. Cavan, CMS' sole member and manager, to cease his unauthorized post-petition activities relating to CMS' Estate.

### F.     Plans

Aside from the Joint Plan, the Debtor and Tri-City have each proposed plans of reorganization in the Chapter 11 Case. The latest versions of these plans, which correspond to the Approved Disclosure Statements, are filed at Dkt. Nos. 327 ("Tri-City Plan") and 328 ("Debtor Plan"). In the Bankruptcy Court's Under Advisement Order conditionally approving the Approved Disclosure Statements, interested parties were ordered to meet and confer regarding setting a confirmation hearing schedule and agreeing on a form of order unconditionally approving the Approved Disclosure Statements. At the meet and confer calls on November 29, 2012 and December 5, 2012, counsel for Tri-City and the Debtor indicated that Tri-City and the Debtor would not pursue solicitation and confirmation of the Tri-City Plan and the Debtor Plan until after the hearing on approval of this Disclosure Statement on January 9, 2013. In hearings on January 9, 2013, neither the Debtor nor Tri-City indicated a desire to proceed with their plans at this time. Additionally, counsel for Arizona Eco, the Note Holder Committee, the Debtor and Tri-City agreed to a *Stipulation to Temporarily Stay Litigation and Solicitation of the Debtor's and Tri-City's Plans* [Dkt. No. 463] memorializing this agreement.[18] Nevertheless, under either

---

[18] The stipulation also provides that the parties agree to continue all deadlines related to the pending appeal and adversary proceedings between the Debtor and Arizona Eco (and/or its affiliates) for a period of sixty (60) days from the date of the stipulation.

approach, as set forth in detail below, the Joint Plan Proponents believe the Joint Plan presents the best, most efficient avenue for recovery for Creditors in this case.

## VII.    OVERVIEW OF THE JOINT PLAN

The following is a general overview of the Joint Plan and certain provisions of the Joint Plan. This overview has been prepared to describe the Joint Plan and some of its more pertinent provisions in basic terms. The Joint Plan Proponents do not offer it as a comprehensive analysis of the Joint Plan, which is a complicated legal document. If it is important to you to understand every nuance of the Joint Plan as a complicated and precise legal contract, you are urged to read the Joint Plan in its entirety and to consult with legal counsel to understand the Joint Plan fully. A copy of the Joint Plan accompanies this Disclosure Statement as **Exhibit "1."**

### A.    Brief Explanation Of Chapter 11 Reorganization

Chapter 11 of the Bankruptcy Code is the chapter of the Code which allows for the reorganization of companies such as GDRH. In general, a Chapter 11 plan of reorganization (a) divides Claims and Interests into separate classes, (b) specifies the property that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor. A Chapter 11 plan may specify that certain classes of Claims or Interests are either to be paid in full upon the effective date of the plan, reinstated, or their legal, equitable and contractual rights are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to under the Bankruptcy Code as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of Claims or Interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property. Such classes are deemed to reject the plan.

All other classes of Claims and Interests that contain "impaired" Claims and Interests are entitled to vote on the plan. As a condition to confirmation, the Code generally requires that each impaired class of Claims or Interests votes to accept a plan. Acceptances must be received (a) from the holders of Claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each impaired class of claims that have voted to accept or reject the plan, and (b) from the holders of at least two-thirds in amount of the allowed

Interests in each impaired class of equity interest that have voted to accept or reject the plan. If any class or classes of Claims or Interests entitled to vote with respect to the plan rejects the plan, upon request of the plan proponents, the Bankruptcy Court may nevertheless confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

Chapter 11 of the Bankruptcy Code does not require each holder of a Claim or Interest to vote in favor of a plan of reorganization in order for the Bankruptcy Court to confirm the plan. However, the Bankruptcy Court must find that the plan of reorganization meets a number of statutory tests (other than the voting requirements described in this section) before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the interests of holders of Claims or Interests that do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

### B.    Solicitation Of Acceptances Of The Joint Plan

The Joint Plan Proponents are seeking acceptances of the Joint Plan from holders of Allowed Claims classified in Classes 2, 5, and 6 under the Joint Plan, which are the only Classes entitled to vote under the Joint Plan, or not deemed by law to have already rejected the Joint Plan. If the requisite acceptances are received, the Joint Plan Proponents will use the acceptances as evidenced by Ballots solicited in accordance with this Disclosure Statement and the order approving the Disclosure Statement to seek confirmation of the Joint Plan under Chapter 11 of the Code.

If any impaired Class is determined to have rejected the Joint Plan in accordance with 11 U.S.C. § 1126, the Joint Plan Proponents may use the provisions of Section 1129(b) of the Code to satisfy the requirements for confirmation of the Plan. See "ACCEPTANCE AND CONFIRMATION OF THE PLAN–Confirmation Over Dissenting Class (Cram Down)."

The Joint Plan Proponents believe that this Disclosure Statement complies with applicable bankruptcy and non-bankruptcy law. This Disclosure Statement and the Joint Plan are being transmitted to all known holders of impaired Claims and Interests. The Joint Plan Proponents believe that this Disclosure Statement contains adequate information for all holders of impaired

Claims to cast an informed vote to accept or reject the Joint Plan. Furthermore, the Joint Plan Proponents believe that holders of impaired Claims will obtain a greater recovery under the Joint Plan than they would under the Tri-City Plan or the Debtor Plan, or would otherwise obtain if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

If the Joint Plan is confirmed by the Bankruptcy Court, each holder of an impaired Claim will receive the same *pro rata* consideration as other holders of Claims in the same Class, whether or not such holder voted to accept the Joint Plan. Moreover, upon Confirmation, the Joint Plan will bind all creditors and equity interests regardless of whether or not such creditors voted to accept the Joint Plan.

## C.    Unimpaired Classes

The following Classes of Claims are not impaired under the Joint Plan and, under Section 1126(f) of the Code, are conclusively deemed to accept the Joint Plan and are not entitled to vote on the Joint Plan:

| Class 1 | Administrative Claims |
| Class 3 | Secured Claim of City of Prescott |
| Class 4 | Secured Claim of Yavapai County Treasurer |

## D.    Classification Of Claims

The Classes under the Joint Plan take into account the differing nature and priority of Claims against the Debtor. Section 101(5) of the Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured;" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." A "claim" against the Debtor also includes a claim against the Debtor's property as provided in § 102(2) of the Bankruptcy Code.

For the holder of a Claim to participate in a reorganization plan and receive the treatment offered to the class in which it is classified, its claim must be allowed. Under the Joint Plan, an

16243608

Allowed Claim shall mean a Claim, of any type, against the Estate only to the extent that (1) a proof of such Claim was timely filed or deemed filed pursuant to § 1111(a) of the Bankruptcy Code, without an objection having been filed or asserted; and (2) the proof of Claim was not objected to, or was Allowed (and only to the extent Allowed) by an order of the Bankruptcy Court that has become final and not subject to possible appeal, review, certiorari, or stay.

### E.    Treatment Of Claims Under The Joint Plan

The following describes the Joint Plan's classification of Claims against the Debtor and the treatment the holders of Allowed Claims would receive under the Joint Plan. The treatment of Claims set forth below is consistent with the requirements of 11 U.S.C. § 1129(a)(9).

### 1.    Classified Claims

As additionally described below, the treatment of Claims (classified under Article IV of the Joint Plan) and the provisions governing distributions on account of Allowed Claims are set forth in Article IV of the Joint Plan. You should refer to the Joint Plan itself for the complete provisions governing the treatment of your particular Claim.

### a.    Class 1 – Administrative Claims

Class 1 is comprised of the holders of administrative expenses. Administrative expenses are those Allowed Claims that have been incurred since the filing of the Debtor's case on March 13, 2012 and before the Administrative Claims Bar Date. Administrative expenses are those set forth in Section 503 of the Code and may include the following:

(1)    Allowed Professional Fees. All administrative priority claims shall be paid in full upon the later of the Effective Date or the entry of an order, which has become final, granting the final allowance of such amounts. If not previously paid by the Debtor, Arizona Eco will pay, subject to the provision for reimbursement by NH Co. LLC as set forth below and in the Joint Plan, all such amounts.

(2)    U.S. Trustee Fees. Any such amounts which remain due and owing will be paid on the Effective Date. The Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6). The Debtor shall file with the Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion

thereof) that the case remains open in a format prescribed by the United States Trustee and shall pay such quarterly fees as due for each quarter post-confirmation that the case remains open. If not previously paid by the Debtor, Arizona Eco will pay all such amounts.

Class 1 is unimpaired and does not vote.

The Joint Plan Proponents estimate that accrued and unpaid Administrative Claims through the date of the filing of this Disclosure Statement, including the fees incurred by the Debtor's Professionals, over and above those Claims already paid on an interim basis and the retainers held by the Debtor's Professionals, may total approximately $650,000.00.

b. **Class 2 – Secured Claim Of Arizona Eco**

Class 2 is comprised of the Arizona Eco's Secured Claim in the amount of $127,337,491.91 as of the Petition Date, which has been disputed by the Debtor. The Secured Claim of Arizona Eco shall be Allowed and treated as follows:

Arizona Eco will receive any and all property and property interests of the GDRH Estate, including, without limiting:

1.     The Arizona Eco Property;

2.     Any and all proceeds relating to the Arizona Eco Property, including, without limiting, those executory leases and/or contracts listed in its Schedule "G" filed by the Debtor on April 15, 2012, as well as all receivables, notes, obligations of the Debtor or the Estate, including the Cavan Suits, except the Claims and Causes of Action to be transferred to NH Co. LLC pursuant to the terms of the Joint Plan.

3.     Any and all other assets of the Debtor, the Estate, or GDRH not expressly excluded under the Joint Plan.

4.     Any and all documents of GDRH, wherever located, including any client documents held by any attorney or other professional engaged by GDRH at any time, including any and all client privileges relating to said documents and related working papers unless, prior to the Effective Date, determined to remain within the GDRH entity subject to the control of the Liquidating Board.

5.     As to the Cavan Suits described in Paragraph 2, *supra,* the management, prosecution, and collection shall occur as follows:

a.     Arizona Eco will have the unilateral authority to fund the necessary fees and costs and in its sole discretion shall control prosecution of the Cavan Suits, including the authority to settle or otherwise resolve the Cavan Suits;

b.     After recovery of all reasonable fees and costs related to the investigation, prosecution, and resolution of the Cavan Suits, the net proceeds shall be remitted on the basis of 80% to Arizona Eco and 20% to NH Co. LLC.

6.     Arizona Eco, in the exercise of its sole discretion, may take title to the Arizona Eco Property alternatively by either a credit bid at a deed of trust sale or by a sale transfer under the Joint Plan upon Arizona Eco's credit bid.  Under either procedure, Arizona Eco agrees or confirms:

a.     Arizona Eco reserves the right to credit bid in an amount it determines to be appropriate at the time;

b.     Arizona Eco will not elect to have an unsecured deficiency claim for the remaining debt stated under its note except by way of a set-off against any Claim asserted by the Cavan Group;

c.     Arizona Eco will agree not to participate in the general class of Unsecured Claims under the Joint Plan except by way of a set-off against any Claim held by the Cavan Group;[19]

d.     Arizona Eco may transfer its note and deed of trust to a designee prior to the Effective Date, which shall be subject to all of the terms, including the limitations and restriction on the Claims of Arizona Eco, set forth in the Joint Plan; and

e.     The Confirmation Order shall provide that pursuant to 11 U.S.C. § 362(d)(1), the automatic stay in GDRH's case is modified *nunc pro tunc* as of the Petition Date, as follows:  all actions taken to notice, perfect, and/or continue the non-judicial foreclosure sale of the Real Property pursuant to A.R.S. § 33-801 *et seq.*, from the Petition Date until the Effective Date are hereby authorized, approved, and ratified such that the trustee's sale may proceed without violating any provision of 11 U.S.C. § 362(a).

7.     Arizona Eco shall have the right to acquire any of the Notes held by any Note Holder for a price equal to 10% of the principal amount of that Note, if none of the Note Holders exercises his, her or its right of first refusal to purchase that Note by following the procedures in section (f) below.  .

8.     Arizona Eco may require that on the Effective Date a dismissal with prejudice accompanying releases be executed by an individual or entity designated by the Liquidating Board, delivered, and/or filed with respect to pending Cavan Suits and execution of appropriate releases.

Class 2 is impaired and is entitled to vote.

---

[19] Arizona Eco currently holds Unsecured Claims under two Notes that would participate in the Note Holder Class unless purchased by other Note Holders.

16243608

c. **Class 3 – Secured Claim Of The City of Prescott**

Class 3 is comprised of the Secured Claim of the City of Prescott in the amount of $26,868.95. The City of Prescott's Secured Claim against the Debtor's Estate shall be treated as follows:

> Arizona Eco shall assume this debt of the Debtor as part of the receipt of the Arizona Eco Property described, *supra,* and subject to any defenses or set-offs. The City of Prescott's Secured Claim shall continue to accrue interest at the statutory rate. The City of Prescott's Claim shall be secured by the same collateral to the extent the Claim was secured pre-petition.

Class 3 is not impaired and not entitled to vote.

d. **Class 4 - Secured Claim Of Yavapai County Treasurer**

Class 4 is comprised of the Secured Claim of the Yavapai County Treasurer, which is unknown. The Yavapai County Treasurer's Secured Claim will be treated as follows:

> The Yavapai County Treasurer's Secured Claim, if any, shall be paid by the party receiving the parcel subject to the tax, either NH Co. LLC or Arizona Eco. The Yavapai County Treasurer's Claim shall be secured by the same collateral to the extent the Claim was secured pre-petition.

Class 4 is not impaired and not entitled to vote.

e. **Class 5 – General Unsecured Claims**

Class 5 is comprised of general Unsecured Creditors with no contractual recourse against a non-debtor. This class may include, but is not limited to: Arizona Department of Transportation, Arizona Public Service, Arizona State Land Department, Bradshaw Public Relations, Burch & Cracchiolo P.C., Clifton Larson Allen LLP, James Cordello, Fennemore Craig, First American Title Insurance, Greg Huber, Quicksilver Express Counter, Hanson Aggregates Arizona, Inc., Cavan Management Services, LLC, Cavan Management Company LLC, Cavan Realty Inc., Mr. Cavan, and other general Unsecured Allowed Claims. Each Class 5 Claim shall receive as follows:

> 10% of its principal Allowed amount after the date of its allowance by a Final Order of the Court, including the final adjudication of any potential set-off, recoupment, or counterclaim, or other suit against the claimant.

Class 5 is impaired and entitled to vote.[20]

### f. **Class 6 – Claims Of The Note Holders**

Class 6 is comprised of Allowed Claims held by the Note Holders, in the aggregate amount of approximately $20 million,[21] which have contractual recourse against CMS. This Class includes, but is not limited to, the Allowed Claims held by the persons identified above in footnote 1. The Note Holders shall be treated as follows:

The Note Holders may either elect for Option A or Option B on or before the deadline for submission of Ballots on the Joint Plan:

**Option A:**

1. On the Effective Date, each Note Holder not electing Option B shall be issued and shall receive a membership interest in NH Co. LLC equal to that Note Holder's percentage of the aggregate dollar amount of all Claims held by all Note Holders in full satisfaction of his, her, or its Claim. Also, on the Effective Date, all of the Notes held by all of the Note Holders electing Option A shall be deemed transferred to NH Co. LLC, as a contribution in exchange for the issuance of the membership interests to which each Note Holder shall be entitled;

2. On the Effective Date, by operation of the Confirmation Order and execution of such other deeds and documents deemed necessary or appropriate by the Note Holders Committee, the Note Holders' Parcels shall be transferred to NH Co. LLC along with all property rights, interests, appurtenances, and improvements related directly thereto, free and clear of any and all lien and encumbrances other than accrued or accruing real property taxes as apportioned to the Note Holders' Parcels in exchange for the debt acquired by NH Co. LLC, through the transfer to it of the Notes from the Note Holders electing Option A. Based on a Broker's Opinion of Value prepared by the national brokerage firm Cassidy Turley, the Note Holders Committee believes the aggregate value of the Note Holders' Parcels is approximately $6.8 to $9.0 million "as is" as of the date of the opinion of value and that the property has future development potential. A true and correct copy of the Cassidy Turley Brokers' Opinion of Value is attached hereto as **Exhibit "13"**;

3. Any Note Holder, other than one controlled by a member of the Cavan Group, may, prior to December 31, 2013, purchase any Note from Arizona Eco for the price paid by Arizona Eco plus: (a) 20% interest thereon from the date of completion of purchase by Arizona Eco through the date of completion of purchase from Arizona Eco, (b) reimbursement of Arizona Eco's

---

[20] Cavan insider-related Claims may be the subject of a motion to designate their votes.
[21] This estimated amount includes principal and interest, and is calculated as of the Petition Date.

16243608

reasonable fees and costs incurred in its purchase process; and (c) assumption and reimbursement of any indemnity related to a Convertible Note acquired by Arizona Eco;

    4.    NH Co. LLC shall receive 20% of the net proceeds of any and all suits, claims, settlements, or other resolutions against the Cavan Group held or owned by the Estate, as described, *supra*;

    5.    NH Co. LLC shall be responsible for 35% of final Allowed Administrative Claims in a total amount not to exceed $450,000, which upon request by NH Co. LLC shall be advanced by Arizona Eco with those advances to be secured by a lien against the 108-acre parcel, to be paid upon sale of any portion of the 108-acre parcel, with interest to accrue at 8% per annum on the advance through the date of payment to Arizona Eco;

    6.    Any and all Claims, including any proceeds related thereto, arising from Claims under Section 547 of the Code, other than Claims against the Cavan Group and/or against any person who sold any Note to Arizona Eco; and

    7.    The Note Holders shall transfer, and not waive, their Claims based on guarantees from CMS and/or its successor and any other member of the Cavan Group, if necessary to settle any litigation regarding Claims held by any member of the Cavan Group.

**Option B:**

    1.    As an alternative to Option A, each Note Holder may elect to receive a cash payment on the Effective Date equal to the lesser of (i) 10% of the original principal of that Note Holder's Note; or (ii) the then outstanding principal amount of the Note. In order to do so, a Note Holder must check the appropriate box on the Ballot and timely serve it on counsel for the Joint Proponents in the manner set forth in this Joint Plan.

    2.    Every other Note Holder participating in Option A shall have a right, on a first come first served basis, ahead of Arizona Eco, to purchase any other Note held by any other Note Holder who elects this Option B, and any Note Holder which elects to exercise that right and then completes such purchase shall receive the distribution of membership interests in NH Co. LLC that otherwise would have been made to the selling Note Holder under the Joint Plan.

    3.    To exercise the option to purchase, each Note Holder, which has elected Option A, must deliver in writing to counsel for the Joint Plan Proponents his, her or its election to purchase any Option B Note listed on the Joint Plan Proponents' Ballot Report, with that notification to be delivered to counsel both for Arizona Eco and the Note Holders Committee on or before the commencement of the Confirmation hearings on the Joint Plan. A report of each Note being purchased by an Option A Note Holder

will be made during the Confirmation proceedings, along with the buyer and the amount to be paid. Any remaining Option B Notes to be purchased by Arizona Eco will also be reported.

Class 6 is impaired and entitled to vote.

g. **Class 7 – Equity Interest Holders**

Class 7 is comprised of the Interests in the Debtor of Tri-City - 39.25%, CMS - 39.25%, GDI - 15.5% and GDEG - 6%, and shall be treated as follows:

All Interests are extinguished and cancelled under the Joint Plan.

Class 7 is deemed to reject the Joint Plan.

F. **Estate Assets**

The assets of the Estate include approximately 15,000 acres of Real Property and related interests, as well as all leases, licenses, rents, claims, proceeds, notes, suits, documents, privileges, contractual rights, and any and all other property interests included within the Estate pursuant to 11 U.S.C. § 541.

G. **Implementation And Funding Of The Joint Plan**

The Joint Plan contemplates the primary distribution of the assets of the Estate between the Arizona Eco and NH Co. LLC. Two parcels of property are to be transferred to NH Co. LLC, with the residue of the Estate being transferred to Arizona Eco. Arizona Eco and NH Co. LLC agree to jointly fund the Allowed Administrative priority Claims of the Estate. General Unsecured Creditors of the Estate will be paid 10% on the principal of their Allowed Claims from funds to be made available by Arizona Eco upon final allowance for any specific Claim. Upon the Effective Date, order(s) are to be entered dismissing with prejudice all suits against Arizona Eco, Mr. Stuart Swanson, Mr. Jason Gisi, and Mr. Michael Fann, along with any attendant releases. Estate Causes of Action against the Cavan Group are to be transferred to and prosecuted by Arizona Eco, with net proceeds of said suits to be distributed 80% to Arizona Eco and 20% to NH Co. LLC. Arizona Eco agrees to take title to all other Property but the Note Holders' Parcels by either completion of a deed of trust sale or a sale free and clear of liens, claims, and encumbrances, pursuant to 11 U.S.C. § 363 or § 1129(b)(2)(A)(ii), under the Joint Plan. Arizona Eco reserves the right to credit bid in an amount it determines to be appropriate at the time, and

agrees not to elect under the Joint Plan to assert a general Unsecured deficiency Claim. A Liquidating Board shall effectuate any final actions needed to wind up the GDRH entity.

## 1. Priority Claim Payments

Arizona Eco will confirm its financial ability to provide cash or cash equivalent in an amount sufficient to pay all allowed Administrative priority Claims as of the Effective Date, and will confirm as of the Effective Date the financial ability to pay, when finally Allowed, any other Administrative Claims against the Estate, subject to reimbursement by NH Co. LLC.

## 2. Property Dispositions

### a. Transfers to NH Co. LLC

(1) the Note Holders' Parcels;

(2) Any and all preference claims of the Estate under Section 547 of the Code, excluding (1) any notes held by Arizona Eco or subject to an indemnification agreement of Arizona Eco; or (2) any insiders of the Cavan Group; and

(3) 20% of the net proceeds of any and all Estate Causes of Action and/or claims against the Cavan Group assigned or transferred to Arizona Eco under the terms of the Joint Plan.

### b. Transfers to Arizona Eco

(1) The Arizona Eco Property and any and all other property interests of the Estate, as defined under Section 541 of the Code, excluding that property and property interests described under Section III(B)(1) of the Joint Plan (property to be transferred to NH Co. LLC under the Joint Plan);

(2) Any and all suits, Claims, and or Causes of Action of GDRH and the Estate, including any and all Claims, suits, and/or Causes of Action assigned by any Creditor or Equity Holder to Arizona Eco, except for any Claims and Causes of Action to be assigned and transferred to NH Co. LLC pursuant to the terms of the Joint Plan; and

(3) 80% of the net proceeds of any and all Claims of the GDRH Estate, and/or assigned by creditors of the GDRH Estate against the Cavan Group; and

(4) Any and all documents of GDRH (as Debtor and debtor-in-possession), which are defined as:

The term "document" or "documents" are used herein in their customary broad sense, and mean any kind of printed, recorded, written, graphic, or photographic matter (including tape recordings), however printed, produced,

reproduced, coded or stored, of any kind of description, whether sent or received, or not, including originals, copies, reproductions, facsimiles, drafts, and both sides thereof, and including without limitation, papers, books, accounts, ledgers, journals, books or memoranda, telegrams, cables, wire transfers, notes, notations, e-mails, texts, work papers, inter and intra-office communications to, between or among directors, managers, officers, agents or employees, transcripts, minutes, reports, and recordings of telephone or other conversations or of interviews or of conferences, or of committee meetings, or of other meetings, agreements, contracts, invoices, statistical records, data sheets, computer tapes or disks, magnetic tapes, computer printouts, computer programs, computer program coding sheets, hard drives, USB flash drives, electronic data storage devices, all other records kept by electronic, photographic or mechanical means, and things similar to any of the foregoing, regardless of their author or origin, of any kind. The term "Document" includes all copies of a document which contain any additional writing, underlining, notes, deletions, or any other markings or notations, or are otherwise not identical copies of the original.

Also included are any said documents generated, stored, retained, maintained by another entity for GDRH such as CMS, CMC, and/or Strategic Management LLC, and/or any professional currently or previously employed by GDRH, including any client privileges thereto.

Arizona Eco may determine prior to the Effective Date to allow Documents and/or Claims against the Cavan Group to remain in the GDRH Estate to assist as needed in litigation wind up.

**H.** **Distributions On Account Of Claims Allowed As Of The Effective Date**

Except as otherwise provided in the Joint Plan, a Final Order, or as agreed to by the relevant parties, initial distributions under the Joint Plan on account of Claims Allowed on or before the Effective Date shall be made as soon as practicable after the Effective Date.

**I.** **Distribution On Account Of Claims Allowed After The Effective Date**

**1.** **Payments And Distributions On Disputed Claims**

Except as otherwise provided in the Joint Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Joint Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the earliest practicable date after the order granting allowance becomes final.

## 2.   Special Rules For Distributions To Holders Of Disputed Claims

Notwithstanding any provision in the Joint Plan and except as otherwise agreed to by the relevant parties:  (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order, and (2) any person who holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and all Claims of such holder have been Allowed.  All distributions made pursuant to the Joint Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligation arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims included in the applicable Class.

## J.   The Liquidation Board

As of the Confirmation Date, all of the Debtor's managers (including CMS) and representatives (including Avion) shall be terminated and shall be replaced with the Liquidation Board.  Arizona Eco and the Note Holders Committee shall each appoint a single manager to serve on the Liquidation Board to co-manage GDRH.  These managers shall serve as the initial managers of GDRH until it is dissolved, the initial managers resign, or the initial manager(s) are replaced by a Final Order of this Court.  The members of the Liquidation Board shall owe no fiduciary duties to any other creditor, member, or party-in-interest, but are appointed solely to: dissolve the Debtor; execute any documents or instruments on behalf of the Debtor necessary to effectuate the provisions of the Joint Plan; and address any issues related to the Debtor's assertion of any legal privilege, including control of any client privilege of GDRH.

## 1.   Qualifications Of The Liquidation Board

The members of the Liquidation Board should be experienced business persons familiar with the provisions of the Joint Plan, and be willing to serve as a manager of GDRH without compensation.  Arizona Eco will appoint Mr. Gisi; the Note Holders will file the name of its member to the Liquidation Board prior to the Confirmation Hearing.

## 2. Meetings Of The Liquidation Board

Within one (1) month of the Confirmation Date, the Liquidation Board shall meet to determine a strategy to wind up the remaining affairs of the Debtor, and meet as often as necessary thereafter to do so. If the Liquidation Board cannot agree on a course of action, then the members shall present their differing proposals to Arizona Eco and the Note Holders Committee by and through their respective counsel for a vote, with each entity having a single vote. If Arizona Eco and the Note Holders Committee become deadlocked, then the matter shall be submitted to the Court for resolution.

## 3. Winding Up Of The Debtor

The Liquidation Board may file such documents and take other such action as may be necessary to wind up the business affairs of GDRH in accordance with Arizona law and other applicable law.

## K. Cancellation Of Old Membership Interests

On the Effective Date: (i) all equity interests shall be cancelled; and (ii) the obligations of GDRH under any agreements, documents, contracts, or certificates of designation governing the equity interests shall be discharged. As of the Effective Date, all equity interests that have been authorized to be issued but that have not been issued shall be deemed cancelled and extinguished without any further action of any party or order of the Bankruptcy Court.

## L. Operative Documents

The Articles of Organization of NH Co. LLC are attached hereto as **Exhibit "6."** Arizona Eco or NH Co. LLC may prepare any and all documents, including, but not limited to, any amendments to the Articles of Organization for NH Co. LLC, any immaterial modifications to the Joint Plan, and any deeds, bills of sale, notices of dismissal, releases, or other documents which are necessary or appropriate to consummate the Joint Plan. If there is any dispute regarding the reasonableness or propriety of any such documents after reasonable and good faith efforts by Arizona Eco or NH Co. LLC to negotiate and obtain approval of the documents by the other affected person(s), any such dispute will be presented to the Bankruptcy Court.

## M.    Administration Pending Effective Date

Before the Effective Date, the Debtor will continue to operate its business, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. After the Effective Date, the Debtor will be liquidated, pursuant to the terms of the Joint Plan, under the supervision of the Liquidating Board, subject to the continuing jurisdiction of the Bankruptcy Court.

## N.    Post-Confirmation Fees; Final Decree

Arizona Eco shall be responsible for paying any post-confirmation fees under 28 U.S.C. § 1930(a)(6). The Liquidating Board shall be responsible for the filing of post-confirmation reports, until a final decree is entered. A final decree is to be entered as soon as practicable after distributions have commenced under the Joint Plan.

## O.    Additional Implementation Of The Joint Plan

### 1.    Assumption Or Rejection Of Executory Contracts And Unexpired Leases Under The Joint Plan

All necessary leases and executory contracts relating to the Note Holders' Parcels will be assumed by the Debtor and, subject to NH Co. LLC's approval of any amount necessary to cure, assigned to NH Co. LLC, unless otherwise provided at the hearing on confirmation or in the Confirmation Order. All other necessary leases and executory contracts will be assumed by the Debtor and, subject to Arizona Eco's approval of any amount necessary to cure, assigned to Arizona Eco, unless otherwise provided at the hearing on confirmation or in the Confirmation Order.

**ANY NON-DEBTOR PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT ASSERTS THAT IT IS ENTITLED TO PAYMENT OF A CURE AMOUNT MUST ADVISE THE BANKRUPTCY COURT AND THE JOINT PLAN PROPONENTS IN WRITING OF SUCH CURE AMOUNT BY THE DEADLINE FOR FILING OBJECTIONS TO CONFIRMATION OF THE JOINT PLAN. FAILURE TO SO ADVISE THE BANKRUPTCY COURT AND THE JOINT PLAN PROPONENTS BY SUCH TIME CONSTITUTES A WAIVER OF ALL CURE AMOUNTS. THE JOINT PLAN PROPONENTS RETAIN THE RIGHT TO OBJECT TO ASSERTED CURE AMOUNTS AND TO HAVE SUCH AMOUNTS DETERMINED BY THE BANKRUPTCY COURT.**

## VIII. BAR DATES FOR ALL CLAIMS

Except as expressly provided in the Joint Plan or Confirmation Order, any Claims (other than Administrative Claims) asserted against the Debtor that may have arisen prior to (or may have been deemed to have arisen prior to) or after the Petition Date, of Creditors who failed to file a proof of Claim on or before July 27, 2012 (the "Bar Date"), are forever barred, stopped, and enjoined from asserting such Claims (or filing proofs of Claim with respect thereto) in any manner against the Debtor or its property or assets. Any Administrative Claims asserted against the Debtor or the Estate that fail to file a proof of Claim, an Application for Allowance or requests for payment on or before the Administrative Claim Bar Date shall be forever barred, stopped, and enjoined from asserting such Claims (or filing proofs of Claim with respect thereto) in any manner against the Debtor or its property or assets. Further, any such unasserted Claims shall not be permitted to vote on the Joint Plan or to participate in any distribution in this Chapter 11 case on account of such Claim, or to receive further notices regarding such Claims and shall be bound by the terms of the Joint Plan.

## IX. LIMITATION OF LIABILITY

The Joint Plan Proponents, their officers, directors, employees, advisors, attorneys, agents, and/or members and the members of the Liquidation Board will not have or incur any liability to any holder of a Claim or an equity interest or the Debtor or any of their respective agents, employees, representatives, financial advisors, or attorneys, or any of their successors or assigns, for any act, event, or omission which relates to, or arises out of, their conduct or action taken or not taken with respect to the Debtor's case, the pursuit of confirmation of the Joint Plan, the consummation of the Joint Plan, or the administration of the Joint Plan or the property to be distributed under the Joint Plan, except for willful misconduct, and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Joint Plan.

**X.      DESCRIPTION OF OTHER PROVISIONS OF THE JOINT PLAN**

   **A.      Vesting Of Assets**

   Subject to the provisions of the Joint Plan, the property of the Estate shall be transferred free and clear of liens on the Effective Date.  As of the Effective Date, all such property is free and clear of all liens, Claims, and Interests, except as otherwise provided in the Joint Plan.

   **B.      Injunction**

   Except as provided in the Joint Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability against the Debtor or the Estate are permanently enjoined from taking any of the following actions on account of any such Claims, debts, or liabilities: (a) commencing or continuing in any manner any action or other proceeding against the assets previously owned by the Estate, GDRH, or the Debtor; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any property to be transferred to any person or entity pursuant to the terms of this Joint Plan; (c) creating, perfecting, or enforcing any lien or encumbrance against any property to be transferred to any person or entity pursuant to the terms of this Joint Plan; (d) asserting a set-off, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor, or any property to be transferred to any person or entity pursuant to the terms of this Joint Plan; and (e) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Joint Plan or the Bankruptcy Code.

   **C.      Retention Of Jurisdiction**

   Notwithstanding confirmation or the Effective Date having occurred, the Court shall retain and have full jurisdiction as is allowed under Title 28 of the United States Code, the Bankruptcy Code, or other applicable law to enforce the provisions, purposes, and intent of the Joint Plan, including, without limitation, any proceedings which relate to:

         1.      Determination of the Allowance, classification, or priority of Claims and Interests, costs, attorneys' fees, interest, and penalties, or objections thereto;

16243608

2.      Construing, implementing, enforcing, executing, or consummating the Joint Plan, the Confirmation Order, any other order of the Court, any document attached as an exhibit to the Joint Plan or contemplated by the Joint Plan, or any other matter referred to in the Joint Plan;

3.      Determination of all matters that are pending before the Court in the Debtor's Case prior to the Effective Date or that may arise after the Effective Date;

4.      Determination of any and all applications for allowance or requests for payment of Administrative Claims, including, without limitation, requests for allowance and payment of compensation and expense reimbursement of the Debtor's Professionals;

5.      Determination of motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and determination of the allowance of any claims resulting from the rejection of executory contracts and unexpired leases;

6.      Determination of all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted prior to the closing of the Debtor's case;

7.      Modification of the Joint Plan pursuant to the Bankruptcy Code and Rules, remedy of any defect or omission in the Joint Plan or Confirmation Order, reconciliation of any inconsistency within the Joint Plan, so as to carry out the intent and purpose of the Joint Plan;

8.      Issuance of injunctions or taking such other actions or making such other orders as may be necessary or appropriate to restrain interference by any party with the Joint Plan or its execution or implementation by any person;

9.      Issuance of such orders in aid of consummation of the Joint Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person, to the full extent authorized by the Bankruptcy Code;

10.     Any determination necessary or appropriate under Section 505 of the Bankruptcy Code or any other determination relating to priority tax claims, taxes, tax refunds, tax attributes, and tax benefits affecting the Debtor, its Estate, or the Debtor's property through the end of the fiscal year in which the Effective Date occurs;

11.     Entry of a final decree closing this Chapter 11 case; and

12.     Determination of such other matters, and for such other purposes, as may be provided in the Confirmation Order.

### D.     Preservation Of Estate Causes Of Action

1.     Estate Causes of Action shall specifically include, without limitation, any and all of the Debtor's causes of action against the Cavan Group, including any actions for negligence, mismanagement, and/or fraudulent transfers against David Cavan, G. Denny Matthew, Gary Burton, and/or Nancy Stone, (b) any and all actions contained, incorporated by, or referenced in Chapter 5 of the Bankruptcy Code, which includes all preference actions and fraudulent transfer actions under §§ 547 and 548, and/or (c) any and all other causes of action, counterclaims, recoupments, setoffs, or other forms of suit under state or federal law.

2.     Failure to list an Estate Cause of Action does not constitute a waiver or release by the Debtor or Joint Plan Proponents of such Estate Cause of Action.

3.     In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided in the Joint Plan, all Estate Causes of Action are retained and reserved, and are assigned and transferred to either Arizona Eco or NH Co. LLC, as provided for in the Joint Plan.

4.     Arizona Eco will, in its sole discretion and authority, prosecute all Estate Causes of Action not transferred to NH Co. LLC, or otherwise expressly compromised and dismissed in the Joint Plan in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code. Arizona Eco or NH Co. LLC, as the case may be, will have discretion to determine in its business judgment which assigned Estate Causes of Action it will pursue or settle, and the terms and conditions of those settlements.

5.     All proceeds from monetary judgments and awards resulting from the settlement or prosecution of the preserved Estate Causes of Action will be applied or distributed as set forth in the Joint Plan.

6.     The discharge and release of assets from Claims as provided in the Joint Plan, except as necessary to be consistent with the Joint Plan, do not diminish or impair the

enforceability of any insurance policy that may cover Claims against the Debtor or any other person or entity.

       7.    Since transactions involving payments of funds from a debtor in the year preceding a bankruptcy filing are more often the subject of preference or fraudulent transfer actions, the Joint Plan Proponents have attached hereto as **Exhibit "15"** documents obtained from the Debtor which list payments from the disclosed GDRH bank accounts covering the one-year period prior to the Petition Date.[22]

### E.    <u>Conditions To Confirmation And Effective Date</u>

#### 1.    <u>Conditions To Confirmation</u>

The following are conditions precedent to confirmation of the Joint Plan:

       a.    The Bankruptcy Court enters a Final Order approving the Disclosure Statement with respect to the Joint Plan.

       b.    The Confirmation Order has been entered in a form and substance reasonably acceptable to the Joint Plan Proponents.  If the Joint Plan Proponents are unable to reach an agreement with any party regarding the form and substance of the Confirmation Order, the Bankruptcy Court will resolve all such disputes between the parties.

       c.    The Confirmation Order contains the following:

       (1)    The provisions of the Confirmation Order are non-severable and mutually dependent;

       (2)    All Executory Contracts or Unexpired Leases assumed by the Debtor during its case or under the Joint Plan remain in full force and effect for the benefit of Arizona Eco notwithstanding any provision in such contract or lease (including those described in Section 365(b)(2) and (f) of the Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

       (3)    Except as otherwise provided in the Joint Plan or the Confirmation Order, the Confirmation Order acts as a release, effective as of the Effective Date,

---

[22] This list was obtained in discovery by Arizona Eco and does not limit in any way other possible Estate Causes of Action.

16243608

of any and all debts of the Debtor secured by any assets of GDRH and/or the Estate, including the Note Holders' Parcels and the Arizona Eco Property, that arose at any time before the entry of the Confirmation Order, including, but not limited to, all principal and any and all interest accrued thereon, pursuant to Section 1141(d)(1) of the Bankruptcy Code. The release of all such Claims shall be effective as to each Claim as to the assets of GDRH and/or the Estate owned on or before the Effective Date, regardless of whether a proof of Claim thereof was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Joint Plan; and

(4) The Confirmation Order, in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code, shall specifically appoint Arizona Eco as a representative and agent of the Debtor to prosecute, compromise, or abandon the Estate Causes of Action transferred to Arizona Eco in accordance with the Joint Plan and shall specifically appoint NH Co. LLC as a representative and agent of the Debtor to prosecute, compromise, or abandon the Estate Causes of Action transferred to NH Co. LLC in accordance with the Joint Plan. Both Arizona Eco and the Note Holders may designate, prior to the Effective Date, to allow Documents and/or Claims to remain in the GDRH Estate during wind-up but subject to the litigation management and procedures under the Plan.

**2.   <u>Conditions To Effectiveness</u>**

The following are conditions precedent to the occurrence of the Effective Date:

a.    The Confirmation Date has occurred;

b.    The Confirmation Order is a Final Order, except that the Joint Plan Proponents reserve the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would moot such appeal;

c.    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, if made, remains pending;

d.    The Bankruptcy Court in the Confirmation Order has approved the retention of jurisdiction provisions of the Joint Plan; and

e.     All documents necessary to implement the transactions contemplated by the Joint Plan are made in a form and substance reasonably acceptable to the Joint Plan Proponents.

### 3.     Waiver Of Conditions

The conditions to Confirmation and the Effective Date may be waived in whole or in part by the Joint Plan Proponents at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to confirmation and consummation of the Joint Plan.

### F.     Non-Allowance Of Penalties And Fines

Except as otherwise expressly provided for in the Joint Plan, no distribution will be made under the Joint Plan on account of, and no Allowed Claim (whether Secured, Unsecured, priority or Administrative) will include any fine, penalty, or exemplary or punitive damages, late charges, default interest, or other monetary charge relating to or arising from any default or breach by the Debtor, and any Claim on account of such fine, penalty, or exemplary or punitive damages is deemed to be disallowed, whether or not an objection is filed to such Claim; provided, however, if prior to the Confirmation Date any Creditor asserting an entitlement to such fine, penalty, exemplary or punitive damages, late charges, default interest, or other monetary charge relating to or arising from any default or breach by the Debtor has filed a motion with the Court specifically seeking the allowance of such fine, penalty, exemplary or punitive damages, late charges, default interest, or other monetary charge relating to or arising from any default or breach by the Debtor, in which event the Court shall determine the extent of the Creditor's Allowed Claim.

### G.     Amendment And Withdrawal Of The Joint Plan

At any time before the Confirmation Date, the Joint Plan Proponents, acting together, may alter, amend, or modify the Joint Plan in a manner permitted by 11 U.S.C. § 1127(a), provided that such alteration, amendment, or modification does not materially and adversely affect the treatment and rights of the holders of any impaired Class of Creditors under the Joint Plan. After the Confirmation Date and before substantial consummation of the Joint Plan as defined in Section 1101(2) of the Code, the Debtor may in the manner provided by 11 U.S.C. § 1127(b), institute proceedings in the Court to remedy any defect or omission or reconcile any

inconsistencies in the Joint Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Joint Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Joint Plan; provided, however, that prior notice of such proceedings must be served in accordance with the Bankruptcy Rules or applicable order of the Court.

The Joint Plan Proponents, acting together, reserve the right to revoke or withdraw the Joint Plan at any time before the Confirmation Date. If the Joint Plan is withdrawn or revoked, then the Joint Plan is deemed null and void and nothing contained in the Joint Plan may be deemed a waiver of any Claims by or against the Debtor or any other Person in any further proceedings involving the Debtor or an admission of any sort, and the Joint Plan and any transaction contemplated by the Joint Plan may not be admitted into evidence in any proceeding.

### H. Filing Of Objections To Claims

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been finally Allowed before the Effective Date, either of the Joint Plan Proponents, or any other person properly entitled to do so after notice, may on or before the date that is 90 days after the Effective Date (i) object to the allowance of any Claim against the Debtor or seek estimation of any Claim on any grounds permitted by the Bankruptcy Code or (ii) pursue an objection to any Claim that has been made before the Effective Date by the Debtor.

### I. Settlement Of Objections After Effective Date

From and after the Effective Date, either of the Joint Plan Proponents may litigate to Final Order, propose settlements of, or withdraw objections to, all pending or filed disputed Claims or any Estate Cause of Action assigned to it, and either of the Joint Plan Proponents may settle or compromise any disputed Claim or Estate Cause of Action assigned to it without notice and a hearing and without approval of the Bankruptcy Court.

### J. Distributions On Allowance Or Disallowance Of Disputed Claims

No distributions shall be made to any holder of a Claim unless and until the Claim becomes an Allowed Claim. If a Claim is not an Allowed Claim as of the Effective Date, distributions on account of that Claim shall commence only when the Claim becomes an Allowed

Claim after the Effective Date or as otherwise specifically provided in the Joint Plan. If a Disputed Claim becomes an Allowed Claim, a distribution shall be made in accordance with the terms of the Joint Plan applicable to Claims of the Class in which that Claim resides.

**K.     Effectuating Documents; Further Transactions; Timing**

The Joint Plan Proponents and any member of the Liquidating Board are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Joint Plan, and any securities issued in accordance with the Joint Plan. All transactions required to occur on the Effective Date under the terms of the Joint Plan will be deemed to have occurred simultaneously.

**L.     Exemption From Transfer Taxes**

In accordance with Section 1146 of the Code:

(a)  the issuance, distribution, transfer, or exchange of Estate property;

(b)  the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, or connection with, the Joint Plan or the Confirmation Order;

(c)  the making, assignment, modification, or recording of any lease or sublease; or

(d)  the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with the Joint Plan,

the Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to the foregoing are not subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the appropriate state or local government officials or agents are directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

### M. Method Of Payment

Payments of cash required to be made under the Joint Plan are to be made by check drawn on a domestic bank or by wire transfer from a domestic bank at the election of the person or entity making such payment. Whenever any payment or distribution to be made under the Joint Plan is due on a day other than a business day, such payment or distribution may instead be made, without interest, on the immediately following business day.

### XI. ACCEPTANCE AND CONFIRMATION OF THE JOINT PLAN

The following is a brief summary of the provisions of the Bankruptcy Code relevant to acceptance and confirmation of a plan of reorganization. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code with their own attorneys.

### A. Confirmation Hearing

Pursuant to Bankruptcy Code Section 1128(a), the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the United States Bankruptcy Court, Courtroom 703, 230 N. First Ave., Phoenix, AZ 85003, commencing on **_____, 2013, at __:___ _.m., M.S.T. (Arizona Time).**

### B. Objections To Confirmation Of The Joint Plan

Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection(s) to confirmation of the Joint Plan must be in writing; must state with specificity the grounds for any such objections; and must be filed with the Bankruptcy Court and served upon the following parties so as to be received on or before the time fixed by the Bankruptcy Court:

> Snell & Wilmer L.L.P.
> Attn: Donald L. Gaffney
> One Arizona Center
> 400 E. Van Buren
> Phoenix, AZ 85004-2202
> E-mail: dgaffney@swlaw.com
>
> Tiffany & Bosco, P.A.
> Attn: Christopher R. Kaup
> Third Floor, Camelback Esplanade II
> 2525 East Camelback Road
> Phoenix, AZ 85016-4237
> E-mail: crk@tblaw.com

### C.    Requirements For Confirmation Of The Joint Plan

For the Joint Plan to be confirmed, the Joint Plan must satisfy the requirements stated in 11 U.S.C. § 1129. In this regard, the Joint Plan must satisfy, among other things, the following requirements:

#### 1.    Best Interests Of Creditors Test

Pursuant to Section 1129(a)(7) of the Code, for the Joint Plan to be confirmed, it must provide that Creditors will receive at least as much under the Joint Plan as they would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. The Joint Plan Proponents believe that the distributions to Creditors under the Joint Plan will exceed the recoveries which Creditors would receive in a Chapter 7 liquidation of the Debtor and its Estate.

Notwithstanding the Joint Plan Proponents' belief that the Joint Plan provides an equal or better return to Creditors than they can otherwise receive under Chapter 7, there can be no assurances that the Bankruptcy Court will conclude that the "best interests of creditors" test has been met. The test will be the subject of evidence presented in conjunction with the hearing on Confirmation of the Joint Plan.

#### 2.    Feasibility

Section 1129(a)(11) of the Code includes what is commonly described as the "feasibility" standard. When the feasibility standard applies, it requires that confirmation of a plan will not be followed by liquidation or the need for further financial reorganization unless the plan provides for that alternative. The Joint Plan Proponents believe that the Joint Plan satisfies the feasibility requirements in that it is a liquidating plan.

#### 3.    Accepting Impaired Class

For the Joint Plan to be confirmed, the Joint Plan must be accepted by at least one impaired Class of Claims. For an impaired Class of Claims to accept the Joint Plan, votes representing at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Joint Plan (not including the votes of insiders of the Debtor).

### D. Confirmation Over Dissenting Class (Cram Down)

Even if an impaired Class of Claims does not accept the Joint Plan, the Bankruptcy Court nevertheless may confirm the Joint Plan at the Joint Plan Proponents' request. Section 1129(b) of the Code provides that if all other requirements of Section 1129(a) are satisfied and if the Bankruptcy Court finds that: (i) the Joint Plan does not discriminate unfairly; and (ii) the Joint Plan is fair and equitable with respect to the rejecting Class(es) of Claims impaired under the Joint Plan, the Bankruptcy Court may confirm the Joint Plan despite the rejection of the Joint Plan by a dissenting impaired Class.

### 1. No Unfair Discrimination

A plan of reorganization "does not discriminate unfairly" if: (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to those of the non-accepting class; and (ii) no class receives payments in excess of those which it is legally entitled to receive on account of its Claims. The Joint Plan Proponents assert that under the Joint Plan: (a) all Classes of impaired Claims are being treated in a manner which is fairly consistent with the treatment of other similar Classes of Claims; and (b) no Class of Claims will receive payments or property with an aggregate value greater than the sum of the Allowed Claims in the Class. The Joint Plan Proponents believe that the Joint Plan does not discriminate unfairly as to any impaired Class of Claims.

### 2. Fair And Equitable

The Bankruptcy Code establishes different "fair and equitable" tests for creditors as follows:

#### a. Secured Creditors

Either: (i) each impaired Secured Creditor retains its lien and receives deferred cash payments having a present value equal to the amount of its Allowed secured Claim; (ii) each impaired secured Creditor realizes the "indubitable equivalent" of its Allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens (subject to Bankruptcy Code § 363(k) credit bidding rights) with such liens attaching to the sale proceeds, and those liens are treated in accordance with clause (i) or (ii) of this subsection.

16243608

b. **Unsecured Creditors**

Either: (i) each impaired Unsecured Creditor receives or gains under the Joint Plan property of a value equal to the amount of its Allowed Claim as of the Effective Date; or (ii) the holders of Claims which are junior to the Claims of the non-accepting Class do not receive any property under the Joint Plan on account of such Claims, except as may be permitted by the new value corollary to the absolute priority rule. To satisfy the new value corollary to the absolute priority rule, Equity Holders must contribute new capital to the debtor that is: (1) an infusion of new value that does not already constitute property of the estate or arise from a prior ownership interest, (2) necessary to the success of the reorganization, (3) substantial in comparison to the amount of unsecured claims in the case, (4) reasonably equivalent to the value retained by Equity Holders and the resulting benefit conferred upon creditors, and (5) in the form of money or money's worth. The Joint Plan Proponents believe that the Joint Plan satisfies the "fair and equitable" test with respect to all impaired classes.

The Joint Plan Proponents have requested, if necessary, confirmation of the Joint Plan pursuant to 11 U.S.C. § 1129(b) with respect to any impaired Class of Claims which does not vote to accept the Joint Plan. The Joint Plan Proponents believe that the Joint Plan satisfies all of the statutory requirements for confirmation as discussed above; that the Joint Plan Proponents have complied or will have complied with all the statutory requirements for confirmation of the Joint Plan; and that the Joint Plan is proposed in good faith. At the hearing on confirmation of the Joint Plan, the Bankruptcy Court will determine whether the Joint Plan satisfies the statutory requirements for confirmation of the Joint Plan.

## XII.  RISK FACTORS

As with any restructuring, the restructuring of the Debtor involves a degree of risk. The actual results of the Joint Plan could differ significantly from those anticipated as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **HOLDERS OF CLAIMS SHOULD CONSIDER CAREFULLY THE FOLLOWING FACTORS, IN ADDITION TO THE OTHER INFORMATION**

16243608

**CONTAINED IN THIS DISCLOSURE STATEMENT, BEFORE SUBMITTING A VOTE TO ACCEPT OR REJECT THE JOINT PLAN.**

### A. Liquidation Factors

As with any plan or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Joint Plan may not prove correct in the future. While efforts have been made to be reasonable in selecting assumptions, there can be no assurance that subsequent events will match those assumptions. Holders of Claims should be aware of some of the principal risks associated with the reorganization which include:

There is a risk that one or more of the required conditions or obligations under the Joint Plan will not occur, or not be satisfied and not waived, which will result in the Joint Plan not being confirmed. Also, the value of the Note Holders' Parcels, when sold, may be less than anticipated and the aggregate amount of proceeds from those sales may be less than the amount to be paid to any Note Holder under Option B provided in the treatment described in Class 6 of the Joint Plan.

### B. Certain Bankruptcy-Related Considerations

#### 1. Risk Of Non-Confirmation Of The Joint Plan

Although the Joint Plan Proponents believe that the Joint Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Amendments or modifications to the Joint Plan may also be required by the Bankruptcy Court for confirmation, and these amendments or modifications could adversely affect the holders of Claims' rights to receive money and other property under the Joint Plan. Any amendment may also necessitate the re-solicitation of votes.

#### 2. Nonconsensual Confirmation

Some Classes could choose not to accept the Joint Plan. The Bankruptcy Court could still confirm the Joint Plan even though that Class rejected the Joint Plan in the following circumstances (in accordance with § 1129(b) of the Code):

- at least one impaired Class accepts the Joint Plan (without including the acceptance of any "insider" in such Class); and

- with respect to each impaired Class that has not accepted the Joint Plan, the Bankruptcy Court determines that the Joint Plan does not discriminate unfairly and is fair and equitable with respect to rejecting impaired Classes.

If any Class fails to accept the Joint Plan in accordance with § 1129(a)(8) of the Bankruptcy Code, the Joint Plan Proponents reserve the right to request confirmation of the Joint Plan in accordance with the circumstances described above and § 1129(b) of the Bankruptcy Code.

## XIII.   TAX CONSEQUENCES OF THE JOINT PLAN

It is not practicable to present a detailed explanation of all of the possible federal income tax ramifications of the Joint Plan and the following is only a summary discussion of certain of the significant consequences which may affect Creditors and others.  This summary is based upon laws, regulations, rulings, and decisions now in effect and upon proposed regulations, all of which are subject to change (possibly with retroactive effect) by legislation, administrative action, or judicial decision.

The Debtor Disclosure Statement, on pages 53-54, states as follows:

> Since formation, Debtor has been a "flow through" entity for income tax purposes.  Accordingly, Debtor's income, expenses and tax attributes has, in general been "passed through" to equity holders, and Debtor has not been obligated directly as a federal income tax taxpayer.  On the Effective Date of the Plan, the Reorganized Debtor will continue to be a flow through entity.

> Debtor anticipates that the consummation of the Plan of Reorganization may result in some recognition of "discharge of indebtedness income," ordinarily taxable under § 61(a)(12)) of the Tax Code.  Debtor believes that such income may be excluded from gross income pursuant to § 1361(a)(1) depending upon the particular circumstances of the equity holder.  Debtor and other parties hereto have also discussed other potential tax issues relating to the reorganization process and restructuring of the AED Secured Claim and anticipate that they may be able to reach agreements to minimize adverse tax impacts.

> In general, creditors receiving cash under the Plan may recognize an ordinary or capital loss based upon the difference

between the amount of their claim and the value of the assets received by them under the Plan.

Under the Joint Plan, all assets of the Debtor's Estate are either to be sold, foreclosed upon, or otherwise transferred out of the Estate. The Debtor entity, however, is not receiving a discharge of any indebtedness under the liquidating Joint Plan, although its assets will be disposed of free and clear of all claims and liens. The largest secured debt of the Estate is held by Arizona Eco, which was $127,337,491.91 as of the Petition Date. By its terms, the Arizona Eco debt is a non-recourse debt as to the Debtor, while being secured by the general assets of the Estate. This debt was created through a carry-back obligation to the Original Owners, in which no cash was advanced to the borrower, GDRH. As a consequence, no discharge of debt income is contemplated. Under the Joint Plan, Arizona Eco agrees not to elect to assert a deficiency claim under Bankruptcy Code § 1111(b).

Of the remaining debt of the Debtor, the majority is held by the Note Holders (approximately $20 million as of the Petition Date). The Joint Plan provides for the Note Holders to receive *pro rata* positions in the newly-formed NH Co. LLC, along with the Estate's non-insider preference actions and 20% of the net recoveries of actions against the Cavan Group. While Note Holders may elect not to participate in this recovery process and in lieu receive a 10% principal cash payment, these underlying Notes are not retired, but rather are transferred to a purchaser who does participate in the Option A recovery process. In summary, on the date of this Disclosure Statement, it cannot be ascertained how much, if any, Note debt may remain unpaid at the conclusion of the Joint Plan's implementation.

The other debt Claims against the Estate consist of almost entirely of approximately $10.3 million of Cavan Group insider Claims that were scheduled by David Cavan. These Claims are anticipated to be the subject of litigation, and it cannot be ascertained at this time how much, if any, of these Claims will be finally Allowed by the Court. A final segment of Unsecured Claims consists of approximately $71,000.00 of miscellaneous unsecured debt, most of which is scheduled as owing to attorneys and accountants who appear to have been employed by GDRH. As with the Cavan Group Claims, the Joint Plan proposes to pay 10% of this debt Class, resulting

1  in a potential that some portion of this debt class minority could remain outstanding under the

2  Joint Plan, although not formally discharged as Claims against the GDRH entity.

3  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR

4  OWN INDIVIDUAL TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL,

5  STATE, AND LOCAL TAX CONSEQUENCES OF THE JOINT PLAN WITH RESPECT TO

6  THEIR CLAIM(S).  NEITHER THE JOINT PLAN PROPONENTS NOR THE JOINT PLAN

7  PROPONENTS' COUNSEL OR OTHER FINANCIAL ADVISORS MAKE ANY

8  REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF

9  CONFIRMATION AND CONSUMMATION OF THE JOINT PLAN AS TO ANY CREDITOR,

10  NOR ARE THE JOINT PLAN PROPONENTS OR THE JOINT PLAN PROPONENTS'

11  COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX

12  CONSEQUENCES.

13  **XIV.  ALTERNATIVES TO THE JOINT PLAN AND CONSEQUENCES OF REJECTION**

14  If the Joint Plan is not confirmed or consummated, the alternatives include: (i) liquidation

15  of Debtor under Chapter 7 of the Bankruptcy Code; or (ii) confirmation of an alternative Chapter

16  11 plan.

17  **A.    Liquidation Under Chapter 7**

18  In evaluating the Joint Plan, the Joint Plan Proponents have considered the alternative of a

19  liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code.  The Joint Plan

20  Proponents believe that the Joint Plan will significantly enhance the prospects for recovery, which

21  may be achieved under the Joint Plan as opposed to Chapter 7 liquidation.

22  In a Chapter 7, an independent trustee would be appointed to liquidate the estate.  The

23  Chapter 7 trustee would make all of his or her own decisions with respect to the liquidation of the

24  estate, the hiring of professionals, the pursuit of any Claims or litigation, the payment of or

25  objection to Claims, and the distribution of any ultimate dividend.  The Chapter 7 trustee would

26  be paid pursuant to the provisions of the Bankruptcy Code, although, in certain circumstances, a

27  Chapter 7 trustee can apply to the Bankruptcy Court for a different type of compensation.

28

It is difficult to compare with any certainty what Creditors might receive under Chapter 7 liquidation versus what Creditors will receive under the Joint Plan. The Joint Plan Proponents believe, however, that the Joint Plan will result in a timelier and greater ultimate recovery to Creditors than would be the case under Chapter 7.

As set forth below in Section XV, the Joint Plan Proponents believe the estimated liquidated value of the Debtor is not more than $40 million. The foregoing does not include the additional administrative expenses associated with a Chapter 7 liquidation, which would further reduce the potential distributions to holders of Allowed Claims. Because the Debtor's secured debt exceeds the value of its assets, no funds would be available for unsecured creditors assuming the Debtor's causes of action against Arizona Eco are unsuccessful. The Note Holders Committee believes that the marginal benefit to the Note Holders from the Debtor proceeding with its pending litigation (the Subordination Suit and the Constructive Trust Suit, described above in Section VI(D)) is outweighed by the likely marginal cost and the probable marginal risk of doing so. In light of the foregoing, the Joint Plan Proponents believe that the Joint Plan provides a recovery, at least equal to, if not better than, a Chapter 7 Liquidation for the holders of Claims.

## B. **Alternative Plans**

If the Joint Plan is not confirmed, the Court could confirm the previously filed plans of the Debtor or Tri-City. Funding of the Debtor Plan depends entirely on the success of its litigation (the Subordination Suit and the Constructive Trust Suit, described above in Section VI(D)) against Arizona Eco. The Plan Proponents understand that the Debtor does not have the funds to proceed with that litigation. In fact, the Note Holders were asked by the Debtor to participate in financing that litigation through a new loan in the amount of $1,350,000.00. As a result, the Note Holders would be required to loan a substantial amount of additional money to the Debtor in order to allow it to proceed with the Subordination Suit and the Constructive Trust Suit. If and only if the Debtor is successful in those actions will it be able to provide any distributions to the Note Holders. The Note Holders Committee believes that the net value that would be returned to

16243608

the Note Holders, even if the Debtor were to be successful in all aspects of that litigation, would be approximately $5 million, paid over a five to eight year period.

The Tri-City Plan, on the other hand, does not require litigation; however, it has not received support from any Creditor other than Arizona Eco. The Note Holders Committee believes that the Tri-City Plan would provide far less to the Note Holders and that return would be far more speculative than the return the Note Holders will receive under the Joint Plan. Moreover, the Note Holders Committee believes that the Tri-City Plan cannot be confirmed without the active support of the Note Holders. Additionally, as set forth above in Section VI(F), Tri-City has agreed to not pursue confirmation of its plan while the Joint Plan Proponents seek to confirm the Joint Plan. With this in mind, the Joint Plan Proponents believe that it is highly unlikely that any alternative plan could be developed or confirmed that would provide greater value or certainty of closure than the Joint Plan.

## XV.  LIQUIDATION ANALYSIS

For the Bankruptcy Court to confirm the Joint Plan, Section 1129(a)(7) of the Code requires Creditors receive under the Joint Plan as much or more than such Creditors would receive if the Debtor were liquidated under Chapter 7. This is the so-called best interests of creditors test. The Joint Plan Proponents believe that the members of each Impaired Class will receive more under the Joint Plan than they would in Chapter 7 liquidation.

Exhibit 7 of the Debtor Disclosure Statement provided the Debtor's liquidation analysis under Section 1129(a)(7):

### LIQUIDATION ANALYSIS

**REVENUES**

| | | |
|---|---|---|
| Sale of Real Property (trustee sale) | 28,500,000 | |
| Net Recovery from AED Litigation | 15,000,000 | |
| Total Revenues | 43,500,000 | |

**EXPENDITURES**

| | | |
|---|---|---|
| Recovery by AED from trustee sale | 28,500,000 | |
| Chapter 7 Trustee fees | 1,305,000 | 3.00% |
| Litigation fees and expenses | 3,000,000 | |
| Chapter 11 Professional Fees | 750,000 | |
| Other Chapter 11 Administrative Expenses | 350,000 | |

| | | Total Claims | % | Amount |
|---|---|---|---|---|
| Priority Expenses and Property Taxes | 100,000 | | | |
| Total Admin and Priority Expenses | 34,005,000 | | | |
| Net available for Unsecured Claims | 9,495,000 | | | |
| General Unsecured Claims | | 65,000 | 31% | 20,292 |
| Noteholders | | 16,350,000 | 31% | 5,104,167 |
| Insider Claims | | 14,000,000 | 31% | 4,370,541 |
| Total Unsecured Claims | | 30,415,000 | | 9,495,000 |

The Joint Plan Proponents, as parties who have not owned or controlled the Property, lack the Debtor's management's internal information regarding the Debtor's Estate; however, the following is additional information of record regarding liquidation:

- The Cavan Group obtained a restricted format appraisal from NAI Horizon Valuation Services Group that indicated a value of the Real Property in the amount of $27,450,000.00 as of August 19, 2011.

- Mr. G. Denny Matthew, effectively the second officer in seniority within the Cavan Group, testified in this case on August 23, 2012, that the Real Property as a whole was worth $40 million.

- The Debtor's above Liquidation Analysis assumes that a Chapter 7 trustee would be ultimately unsuccessful in pursuing the suits against Arizona Eco, Mr. Gisi, Mr. Fann, and Mr. Swanson. While these suits as currently pled seek all value of Arizona Eco's note over its $31.5 million purchase price, the Liquidation Analysis assumes that the Chapter 7 trustee would instead obtain a $15 million settlement after expending an additional $3 million in "Litigation Fees and Expenses." The logic behind these assumptions is not detailed in the Debtor Disclosure Statement; however, some of the obstacles to the Debtor's litigation against Arizona Eco, *et al.*, are discussed in Section VI(D), *supra*.

Therefore, as of the date of this Disclosure Statement, the Joint Plan Proponents estimate the liquidation value of the assets of the Debtor's Estate is approximately $40 million. Of course, that assumes the assets of the Estate could be sold for $40 million.

## A. Note Holders Committee's Liquidation Analysis[23]

**The Note Holders Committee has carefully analyzed the legal and factual issues in this case and negotiated actively and aggressively with the Debtor and Arizona Eco, and believes that the Note Holders will receive a far greater return under the Joint Plan than if the assets of the Estate were liquidated by a trustee under Chapter 7 of the Code.** Specifically, the Note Holders Committee believes that the right to receive a membership interest in NH Co. LLC, which will own the Note Holders' Parcels, free and clear of liens, which have an aggregate "as is" value of approximately $6.8 to $9.0 million based on the Cassidy Turley Brokers' Opinion of Value, attached hereto as **Exhibit "13,"** or the right to elect to receive a 10% "cash out" under Option B will allow each Note Holder to choose an alternative which will be far better for him, her, or it than if the assets of the Estate are liquidated under Chapter 7. The following constitutes the Note Holders' Liquidation Analysis of the property of the Estate premised on the assumption that the Debtor's property could, in fact, be liquidated by a Chapter 7 trustee under two alternatives: (1) the Debtor is not successful in its litigation with Arizona Eco; and (2) the Debtor raises the funds necessary to pursue litigation against Arizona Eco and is successful in all respects in that litigation:

| If Debtor is Not Successful in Litigation | | If Debtor Is Successful in Litigation | |
|---|---|---|---|
| Revenue | | Revenue | |
| Trustee Sale by Arizona Eco | $40,000,000.00 | Sale of Assets | $40,000,000.00 |
| Expenses | | Expenses | |
| Amt to Arizona Eco | $40,000,000.00 | Amt to Arizona Eco | $30,500,000.00 |
| Chapter 7 Trustee fees | $0.00 | Chapter 7 Trustee fees | |
| Litigation fees and expenses | $ 3,000,0000.00 | Litigation fees and expenses | $3,000,0000.00 |
| Chapter 11 Professional Fees | $ 1,000,000.00 | Chapter 11 Professional Fees | $1,000,000.00 |
| Other Ch 11 Admin Expenses | $ 350,000.00 | Other Ch 11 Admin Expenses | $ 350,000.00 |
| Priority Exp's & Property Taxes | $ 100,000.00 | Priority Exp's & Property Taxes | $ 100,000.00 |

---

[23] Section XVI(A) consists of the opinions and analysis of the Note Holders Committee, and does not represent the views or opinions of any other party, including Arizona Eco.

| | | | |
|---|---|---|---|
| Net Available for Unsecured Claims | $ -4,450,000.00 | Gross Cash in Ch 7 Estate | $ 5,050,000.00 |
| | | Ch 7 Trustee's Fees (3%) | $ 151,500.00 |
| | | Net Available for Unsecured Claims | $4,898,500.00 |
| | | Claims to be Paid from Estate | |
| | | Note Holders | $20,000,000.00 |
| | | Unsecured Claims | $ 65,000.00 |
| | | Insider Claims | $14,000,000.00 |
| Aggregate Amt of Unsecured Claims | $34,065,000.00 | Aggregate Amt of Unsecured Claims | $34,065,000.00 |
| % Distribution to Unsecured Creditors | 0% | % Distribution to Unsecured Creditors 14.38%[24] | |

The Note Holders Committee has doubts the Debtor will be successful in raising a substantial amount of money to pay its legal fees for the litigation with Arizona Eco from its Equity Holders. That means the only way the Debtor could pay its lawyers to continue with the litigation with Arizona Eco is to obtain financing from the Note Holders. If that becomes true, each Note Holder may be faced with loaning his, her, or its *pro rata* portion of an additional $1,500,000.00 to $3,500,000.00 to the Debtor to cover legal fees with no guarantee of any results. Moreover, the return to the Note Holders from making those additional loans will be totally dependent on the value of the Debtor's real estate and will only be paid to them over a term of years. **Based on this analysis, the Note Holders Committee strongly advises each of the Note Holders to vote to accept the Joint Plan**.

The Joint Plan Proponents reserve all rights to introduce additional evidence at a confirmation hearing on the Joint Plan as to the liquidation value of the assets of the Debtor's Estate.

## XVI. RECOMMENDATION AND CONCLUSION

The Joint Plan Proponents sincerely believe that the Joint Plan is the best possible means of satisfying the Claims of Creditors. Therefore, the Joint Plan Proponents recommend confirmation of the Joint Plan and urge all holders of Impaired Claims to vote to accept the Joint

---

[24] Arizona Eco submits that this figure for projected net recovery is unrealistic and that any settlement value would be of negligible net value to the Debtor's Estate.

Plan, and to indicate that acceptance by returning their Ballots so that they are received by no later than the Voting Deadline.

**[REMAINDER OF THIS PAGE DELIBERATELY LEFT BLANK]**

1        DATED this 24th day of January, 2013.

2   **ARIZONA ECO DEVELOPMENT LLC,**        **AD HOC COMMITTEE OF**
   **an Arizona limited liability company,**        **NOTE HOLDERS**
3

4   By: _____        By: _____
       JASON GISI                
5   Its:   President                Its:   Chair

6   **SNELL & WILMER** L.L.P.           **TIFFANY & BOSCO, P.A.**
7

8   By: __/s/ Donald L. Gaffney_____    By: _____
       Donald L. Gaffney            Christopher R. Kaup
9       Benjamin W. Reeves          J. Daryl Dorsey
       Evans O'Brien              Third Floor, Camelback
10     Jill H. Perrella              Esplanade II
       400 E. Van Buren           2525 East Camelback Road
11     Phoenix, Arizona 85004-2202      Phoenix, AZ 85016-4237
       *Attorneys for Arizona Eco*       *Attorneys for the Ad Hoc*
12     *Development LLC*           *Committee of Note Holders*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

61

16243608